Donald PRICE and Melvin E. Price, Minors by their father and next friend, Jesse Price, et al., Appellants,

v.

The DENISON INDEPENDENT SCHOOL DISTRICT BOARD OF EDUCATION et al., Appellees.

No. 21632.

United States Court of Appeals
Fifth Circuit.

July 2, 1965.

Before BROWN and BELL, Circuit Judges, and HUNTER, District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal on behalf of Negro school children questions the District Court's decision sustaining the adequacy of the Denison, Texas grade-a-year, stair-step plan of desegregation [1] voluntarily instituted, without threat of lawsuit, on June 23, 1963. For reasons set forth, we vacate the judgment and remand the case to enable the School Board to submit a substantially stepped-up plan under the guidance of the District Court.

Up to spring of 1963 Denison maintained a dual-zoned, totally segregated school system.[2] On June 24, 1963, the Board in good faith passed the resolution, and in September the first grade was desegregated. Nine years in the making, the plan would reach the top of the stairs (12th grade) in 1975, two decades after Brown. The following January (1964) the plaintiffs brought a class suit for swift and sweeping relief.[3]

The District Judge held in light of all the circumstances that this voluntary plan was a "prompt and reasonable start toward full compliance." In his memorandum opinion which acknowledged

Derrick A. Bell, Jr., New York City, Weldon H. Berry, Houston, Tex., Jack Greenberg, Inez V. Smith, New York City, for appellants.

Charles H. Gullett, Robert L. Doss, Joe C. Crawford, Denison, Tex., for appellees.

1. The School Board resolved: "[T]hat the Denison Independent School District will integrate the first grade effective September, 1963, progressing an additional grade each year thereafter. until complete. Each first grade child may attend the school of his choice within his attendance area."

2. Appellants' brief describes the school population and facilities as follows:
"In February 1964, there were 5,070 students in the District. Only 665 were Negro. Negroes were assigned to three of ten elementary schools and to one each of the system's two junior and senior high schools. Each of the white elementary schools offer grades 1–6 and enroll from 230 to 400 pupils. But the schools designated for Negroes are generally small, and enroll very few pupils. Langston has 36 students and 2 teachers, Walton has 20 students and 2 teachers, and Wim has 93 students and 4 teachers.

The Negro Terrill Junior and Senior High School has 109 students and from 15 to 17 teachers, while the white Denison Junior and Senior High Schools contain a total of 2,100 students and 100 teachers."

3. Named plaintiffs were 16 Negro children (and their parents), each of whom was in a grade higher than the first so that under the Board's plan he or she would never attend desegregated schools. The prayer requested that the segregated school system, in all its particulars, be enjoined, or in the alternative, that the Court order the Board to present "a complete plan for desegregation of all grades * * * by the school year 1964–65; including assignment of pupils, teachers, principals, and other school personnel on a non-racial basis; * * * funds, * * * construction, * * * budgets, * * * extra-curricular activities * * *."

frankly that constitutional rights of most of the Negro children were being infringed, Judge Sheehy took note of several factors. These included the good faith of the School Board in voluntarily instituting this gradual plan, the fact that several other localities in that same area of the Eastern District of Texas had likewise voluntarily initiated the same stair-step plan and one had done so by court order. And for good reason he pointed to many decisions of this Court, including specifically, Ross v. Dyer, 5 Cir., 1963, 312 F.2d 191, where, dealing with a side issue under the Houston stair-step plan,[4] we recognized the unusual moratorium on constitutional rights under the "deliberate speed" concept.

Of course, that was a Court-ordered plan instituted in 1960, and many things have happened since then—not the least of which is that five years have gone by.[5] And for this constitutional right, time alone is of great moment. Already some of these children have graduated. For them delay has meant denial for all time. The time for reviewing or redeveloping the undulating administra-

tive doctrines evolved by us for the implementation of Brown is over. The history, mandatory requirements, and increased tempo of judicial action are completely traced in Lockett v. Board of Educ. of Muscogee Cty. School Dist., Ga., 5 Cir., 1965, 342 F.2d 225. This history tells all that "[t]he rule has become: the later the start, the shorter the time allowed for transition." 342 F.2d at 228.[6] From this history all in this Circuit know other specific things. The first is that, if challenged, a grade a year will not pass muster. Second, the process must work simultaneously from both ends—first grade and last grade. Third, the end is in sight and all grades must be desegregated by the opening of school term fall 1968–69.

Moreover, to this rapidly accelerating pace set by judicial action, added impetus has come from the passage of the Civil Rights Act of 1964 which declares the strong legislative policy against racial discrimination in public education[7] and then in Title VI implements this in a tangible way by conditioning Federal financial assistance on compliance.[8] This

4. The Houston plan has now been substantially accelerated by voluntary Board action. See Houston Post and Houston Chronical, June 23, 1965.

5. But in Ross v. Dyer, we sounded a warning that the passage of time would, or might, require a change even for an existing court approved plan. We said: "* * * it is now clear that even though the 1960 order prescribes a plan in specific detail, this is not the end of the matter. The District Court of necessity retains continuing jurisdiction over the cause. That means that it must make such adaptations from time to time as the existing developing situation reasonably requires to give final and effectual voice to the constitutional rights of Negro children." 312 F.2d at 194.

6. See Bivins v. Board of Educ. and Orphanage for Bibb Cty., Ga., 5 Cir., 1965, 342 F.2d 229; Armstrong v. Board of Educ. City of Birmingham, 5 Cir., 1964, 333 F.2d 47; Davis v. Board of School Commissioners of Mobile Cty., 5 Cir., 1964, 333 F.2d 53; Stell v. Savannah—Chatham Cty. Bd. of Educ., 5 Cir., 1964,

333 F.2d 55; Gaines v. Dougherty Cty. Bd. of Educ., 5 Cir., 1964, 334 F.2d 983. Also, Watson v. City of Memphis, 1963, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529; Goss v. Board of Educ. of City of Knoxville, Tenn., 1963, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; Griffin v. County School Bd. of Prince Edward Cty., 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256; Calhoun v. Latimer, 1964, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288. Of course most of these cases were decided after the District Judge rendered his decision in this case.

7. Act of July 2, 1964, Pub.L. 88–352, Title IV, §§ 401–410, 78 Stat. 246–249, 42 U.S.C.A. §§ 2000c to 2000c–9.

8. "Sec. 601. No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Act of July 2, 1964, Pub.L. 88–352, Title VI, § 601, 78 Stat. 252, 42 U.S.C.A. § 2000d.

was implemented by Department of Health, Education & Welfare (HEW) regulations,[9] issued pursuant to § 602, 42 U.S.C.A. § 2000d–1. These provide that to be eligible for Federal assistance, the applicant must execute an assurance of compliance [10] which shows (1) that the school system is subject to a final court order of desegregation, or (2) a desegregation plan, determined to be adequate by the Commissioner of Education. Of great importance to our problem is the General Policy Statement,[11] issued by the Commissioner of Education in April 1965, setting forth requirements which plans submitted under (2) must meet. As to the rate of desegregation, the Policy Statement (Part V.E.) sets the fall of 1967 as the target date for total desegregation for applicant school systems, and for those starting in 1965, the normal specification will be four grades for 1965–66.[12]

In Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 1965, 348 F.2d 729 [June 22, 1965], we accorded these minimum standards a high place in our future handling of school cases totally without regard to whether a school district was seeking (or desired) Federal grants in aid. Judge Wisdom, for the Court, wrote:

"We attach great weight to the standards established by the Office of Education. The judiciary has of course functions and duties distinct from those of the executive department, but in carrying out a national policy we have the same objective. There should be a close correlation, therefore, between the judiciary's standards in enforcing the national policy requiring desegregation of public schools and the executive de-

partment's standards in administering this policy. Absent legal questions, the United States Office of Education is better qualified than the courts and is the more appropriate federal body to weigh administrative difficulties inherent in school desegregation plans." 348 F.2d at 731.

More than that, we put these standards to work. To avoid the temptation to recalcitrant or reluctant school systems to seek judicial approval of a token plan as the basis for Federal aid under alternative (1) for court plans, the Court held the Jackson plan inadequate and directed that a plan modeled after the Commissioner of Education's requirements (note 11, supra) be submitted for the fall of 1965–66.

█  This signals what will be a frequent approach to these cases as they come to District Courts and thereafter this Court. These executive standards, perhaps long overdue, are welcome. To many, both on and off the bench, there was great anxiety in two major respects with the Brown approach. The first was that probably for the one and only time in American constitutional history, a citizen—indeed a large group of citizens—was compelled to postpone the day of effective enjoyment of a constitutional right. In Ross v. Dyer, 5 Cir., 1963, 312 F.2d 191, 194, we recognized that under "a stair-step plan Negroes not in the eligible classes continue to suffer discriminatory treatment." That there can be a moratorium on the enjoyment of such rights runs counter to our notions of ordered liberty. Second, this inescapably puts the Federal Judge in the middle of school administrative problems for which he was not equipped and tended to dilute local responsibility for the high-

---

9. 45A C.F.R. § 80(c) (December 4, 1964).

10. HEW Form 441, provided for this purpose.

11. General Statement of Policies Under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools, HEW, Office of Education, April 1964. See Appendix.

12. " * * * the grades covered must include the first and any other lower grade, the first and last high school grades, and the lowest grade of junior high where schools are so organized." Policy Statement, VE4a(1).

ly local governmental function of running a community's schools under law and in keeping with the Constitution.

■ By the 1964 Act and the action of HEW, administration is largely where it ought to be—in the hands of the Executive and its agencies with the function of the Judiciary confined to those rare cases presenting justiciable, not operational, questions.

A word is certainly due for Denison's having initiated its plan voluntarily. Although we conclude that the passage of time and the ceaseless flow of court decisions make the District Judge's approval of the one grade stair-step plan now unacceptable, it is clear that he was convinced—as were we on argument—of the School Board's good faith desire to do what the law requires. That has much significance in fashioning the time, scope, and nature of the relief. But in the final analysis it has limited bearing on the substantive rights accorded and specifically the speed of the plan. The rights of Negro children come from the Constitution, not the attitude, good or bad, of school administrators.

■ We were impressed with the repeated assurances of the school authorities along two lines. The first was that they mean to comply fully with whatever is required. Second, if we found the present plan inadequate, a peremptory order, either direct or through the District Court, would not be necessary as they desire to submit to the District Court a plan which will meet the standards coming out of this appeal. This is the way it ought to work. We take them at their word. If any differences arise, the District Court can resolve them.

■ The applicable standard is essentially the HEW formulae for 1965–66, leaving for a later time whether, in this case, the final date is fall 1967–68 or, as in our recent Court decisions, 1968–69.[13]

■ This leaves the issue of desegregated teacher assignments.[14] Judge Sheehy was in error in questioning the standing of these plaintiffs to raise this issue. Board of Public Instruction of Duval Cty., Fla. v. Braxton, 5 Cir., 1964, 326 F.2d 616, 620; Augustus v. Bd. of Public Instruction of Escambia Cty., 5

---

13. Grade 3, which will be reached on the voluntary stair-step, should be counted as one of the 4. Under our decisions the 12th grade must also be included. As the School District has separate junior and senior high schools, if the HEW plan (Part VE4a(1), note 12, supra) is followed, the remaining two would be grades 7 and 10. Since there can never be any resegregation, if this were followed this would mean that by fall 1967–68, only grade 6 would remain segregated, as follows:

| | Elementary | | | Junior High | | Senior High | |
|---|---|---|---|---|---|---|---|
| Year | Present | To Add | Automatic | To Add | Automatic | To Add | Automatic |
| 65–66 | 1 2 | 3 | | 7 | | 10 12 | |
| 66–67 | | | 4 | | 8 | | 11 |
| 67–68 | | | 5 | | 9 | | |

However, should the School Board decide to add grades 4, 5, and 6, or other combination of lower grades in 1965–66, as previously emphasized, grade 12 must be added, and the plan must provide suitably for desegregation of grades 11 and 10, or vice versa, in the years 1966–67 and 1967–68, leaving in such event only grade 9 for 1968–69.

---

14. There is also perhaps a tag end problem as to bus transportation. We think this was essentially a question of location and should solve itself as Negro children cross former dual zone boundaries to attend formerly all white schools more distant than the Texas 2-mile minimum.

Cir., 1962, 306 F.2d 862; Lockett v. Bd. of Educ. Muskogee Cty., Ga., 5 Cir., 1965, 342 F.2d 225, 229. But on the merits we think it best for the moment to leave this to the District Court for consideration by and with the Board as the imported HEW standards are applied. The whole matter may become academic in any event. For if the Denison School District obtains Federal financial aid, HEW regulations will require adjustment. (See e. g., General Policy Statement, Appendix, VB.)

To enable the parties to move with dispatch, the judgment is vacated, the cause remanded for consistent action, the mandate to issue forthwith.

Vacated and remanded.

## APPENDIX

### GENERAL STATEMENT OF POLICIES UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 RESPECTING DESEGREGATION OF ELEMENTARY AND SECONDARY SCHOOLS

I. Applicability of Title VI of the Civil Rights Act of 1964 to Desegregation of Elementary and Secondary Schools

Title VI of the Civil Rights Act prohibits the extension of Federal financial assistance to any dual or segregated sytem of schools based on race, color, or national origin. To be eligible to receive, or to continue to receive such assistance, school officials must eliminate all practices characteristic of such dual or segregated school systems.

II. Methods of Compliance—General

Elementary and secondary schools or school systems may qualify for Federal financial assistance by:

A. Executing an Assurance of Compliance (HEW Form 441), if the requirements specified in III below are satisfied; or

B. Submitting a final order of a court of the United States for the desegregation of the school or school system which satisfies the requirements specified in IV below, together with an Initial Compliance Report (See VI below); or

C. Submitting a plan for the desegregation of the school system which the Commissioner of Education determines is adequate to accomplish the purposes of the Civil Rights Act, as set forth in these policies (see V below) together with an Initial Compliance Report (see VI below); and

D. Implementing the Assurance, final court order or desegregation plan in good faith so as to effectuate the basic objective set forth in section 601 of Title VI of the Civil Rights Act:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

III. Methods of Compliance—Assurance of Compliance (HEW Form 441)

An Assurance of Compliance (HEW Form 441) that will qualify a school system for Federal financial assistance may not be executed by a school system in which:

A. The race, color, or national origin of pupils is a factor in their initial assignment, reassignment, or transfer to a particular school or class within a school; or

B. Teachers or other staff who serve pupils remain segregated on the basis of race, color, or national origin of the pupils in a school; or

C. Any activity, facility or other service, including transportation, provided or sponsored by a school system is segregated on the basis of race, color, or national origin; or

D. There remain any other practices characteristic of dual or segregated school systems.

IV. Methods of Compliance—Court Orders

A. A school system subject to a final order of a court of the United States will

be eligible for Federal financial assistance only if the order directs desegregation of the school system; it does not suffice if the order merely directs school authorities to admit certain named persons or otherwise fails to require the elimination of a dual or segregated system of schools based on race, color, or national origin.

B. School districts submitting a final court order should send official copies of the court order, together with an Initial Compliance Report as described in VI below, indicating the present state of compliance with the order and the school district's program for continued compliance.

V. Methods of Compliance—Plans for the Desegregation of School Systems

A. *Types of Desegregation Plans.*

A school system will be eligible for Federal financial assistance by submitting a desegregation plan providing for the assignment, reassignment, and transfer of pupils to or within schools on the basis of:

1. Geographic attendance areas, subject to the requirements of sections B and C below;

2. Freedom of choice granted to and exercised by the pupil and his parents or guardians, subject to the requirements of sections B and D below; or

3. A combination of geographic attendance areas and freedom of choice.

B. *Requirements Which All Desegregation Plans Must Satisfy.*

1. *Faculty and staff desegregation.* All desegregation plans shall provide for the desegregation of faculty and staff in accordance with the following requirements:

a. *Initial assignment.* The race, color, or national origin of pupils shall not be a factor in the assignment to a particular school or class within a school of teachers, administrators or other employees who serve pupils.

b. *Segregation resulting from prior discriminatory assignments.* Steps shall also be taken toward the elimination of segregation of teaching and staff personnel in the schools resulting from prior assignments based on race, color, or national origin (see E4b below).

2. *Nondiscrimination in other school affiliated services, facilities, activities and programs.* All desegregation plans shall provide for the elimination of discrimination based on race, color, or national origin, with respect to services, facilities, activities and programs sponsored by or affiliated with the schools of the system. If bussing or other transportation is furnished or sponsored by the school or school system, the plan shall call for its provision without discrimination based on race, color, or national origin.

3. *Preparation of pupils, teachers, staff and community for desegregation.* All desegregation plans shall contain specific information as to actions that will be taken to prepare pupils, teachers, staff personnel and the community for the changes which will be involved in desegregating the school system.

4. *Notice.*

a. All desegregation plans shall provide for their publication in a conspicuous manner in a newspaper having general circulation in the geographic area served by the school system, reasonably in advance of the time for any action which may be taken by pupils under the plan;

b. All desegregation plans shall provide for notification to pupils currently enrolled in the school system and to their parents or guardians in sufficient time to enable them to understand and take advantage of their rights to initial assignment, reassignment or transfer for the coming school year, and for the mailing of such notices to parents or guardians of pupils then enrolled or

for their distribution in any other manner that will assure their receipt by parents or guardians;

c. All desegregation plans shall be accompanied by sample copies of the notices to be given respecting each of the following categories:

(1) The initial assignment of pupils intending to enter schools of the system for the first time;

(2) Initial assignment of pupils intending for the first time to enter a school of higher level after having completed a school of less advanced level; and

(3) The reassignment or transfer of pupils for the forthcoming school year.

5. *Subsequent court orders.* If, after submission of a desegregation plan, a final order of a court of the United States is entered calling for the desegregation of the school or school system covered by the plan, the plan shall be revised, if necessary, to meet the requirements of the court order and of any future modification of the order.

6. *Performance as a test of plan.* The Commissioner of Education may from time to time redetermine the adequacy of any desegregation plan to accomplish the purposes of the

Civil Rights Act.

C. *Plans Based on Geographic Attendance Areas.*

A desegregation plan which proposes to assign, reassign or transfer pupils on the basis of geographic attendance areas shall contain provisions that will meet the following requirements as to all grades covered by geographic zoning:

1. *Attendance zones.* Racially separate attendance zones shall be abandoned entirely and each attendance zone shall be part of a single, nonracial system of attendance zones. Zone lines shall be drawn to follow the natural boundaries or perimeters of compact areas surrounding particular schools.

2. *Initial assignment.* All pupils shall be initially assigned to the school for the geographic attendance zone in which they reside.

3. *Attendance outside zone of residence.* The rules or practices under which pupils are reassigned or permitted to transfer to a school outside their zone of residence shall not take race, color, or national origin into account.

4. *Right to attend in zone of residence.* At the beginning of any school year any pupil attending a school outside his zone of residence shall have the right to transfer to and attend the school in his zone of residence.

5. *Notice.* Each pupil and his parents or guardians shall receive notice of the school to which the pupil is assigned which satisfies the requirements of B4 above.

D. *Plans Based on Freedom of Choice.*

The responsibility to eliminate segregation rests with the school authorities and is not satisfied by rules and practices which shift the burden of removing discrimination to the class or classes of persons previously discriminated against. Desegregation of a school system may, however, be initiated by a "free choice" plan containing provisions that will meet the following requirements as to all grades covered by free choice:

1. *Adequate opportunity to make a choice.* No pupil shall be assigned, reassigned or transferred without being given once annually, at an appropriate time, an adequate prior opportunity to make an effective choice of school.

2. *Pupil placement laws.* The criteria of pupil placement laws or similar statutes, rules or practices shall not be used to limit desegregation through restriction of any pupil's right to free choice.

3. *Initial assignment: lowest elementary grade levels.*

a. Announcement of the procedures for initial assignment of pupils to the lowest elementary grade level (including preschool and kindergarten classes where available) shall be made by full notice in the press.

b. The times and places for, and manner of, preregistration and enrollment shall be fixed so that a free choice may be made easily by each pupil.

c. If overcrowding will result at a particular school from the choices made, initial assignment shall be made either by giving preference to the pupils residing closest to the school or on the basis of non-racial attendance zones. If no choice is made, they shall be assigned to the school nearest their homes or on the basis of non-racial attendance zones.

4. *Initial assignment; lowest grade of junior high, high or other school above elementary level.*

a. Announcement of the initial assignment of pupils to the lowest grade of junior high, high or other school above the elementary level shall be made by individual notices to each pupil and his parents or guardians. The notices shall be furnished reasonably in advance (as specified in the plan) of the time for filing the form for exercising choice of the school next to be attended, together with copies of the form. Copies of the notice and the form shall be submitted together with the plan.

b. If overcrowding will result at a particular school because of the choices made, initial assignments shall be made either by giving preference to the pupils residing closest to such school or on the basis of non-racial attendance zones.

c. Pupils may either be required to make a choice of schools or be initially assigned, if they do not make a choice, to the school nearest their homes, or on the basis of non-racial attendance zones.

5. *Reassignment or transfer: all other grades to which freedom of choice policy applies.*

a. In all other grades to which the freedom of choice policy applies, every pupil shall be informed by individual notice addressed to himself and his parents or guardians: (1) of his right to transfer to a school of his choice, and (2) where copies of the form for exercising this transfer right may be readily obtained in the school and elsewhere.

b. If overcrowding will result at a particular school because of the choices made, the pupil shall either be given preference over pupils residing farther from the school or shall be permitted to attend another school of his choosing within a reasonable distance of his residence.

6. *Initial assignment: pupils entering school system for first time or who become eligible to attend some other school in the system by reason of change of residence.* Any pupil who either enters the school system for the first time or becomes eligible to attend some other school in the system by reason of a change of residence shall be initially assigned without regard to race, color, or national origin.

7. *Transportation.* The exercise of free choice shall not be restricted by transportation practices. Transportation shall be provided to pupils under a free choice policy on the same basis as it is provided to other pupils attending the same school.

8. *Notice.* All notices to pupils and their parents or guardians respecting the initial assignment, reassignment or transfer to or within schools shall:

a. State simply and clearly the applicable rules and administrative practices regarding the rights which the desegregation plan accords pu-

pils with respect to initial assignment, reassignment, or transfer, to or within the schools;

b. Give the times, dates, and places at which pupils, or their parents or guardians may exercise their rights under the desegregation plan; and

c. Include an assurance that school personnel will neither favor nor penalize any pupil because of the choice he makes in the exercise of his rights under the desegregation plan.

E. *Rate of Desegregation.*

1. Every school system which submits a plan that fails to provide for the desegregation of every grade in all the schools within its system by the beginning of the school year 1965–1966 must sustain the burden of justifying the delay and must include in its desegregation plan a time schedule for such desegregation.

2. The fall of 1967 is set as the target date for the extension of desegregation to all grades of school systems not fully desegregated in 1965–1966 as a qualification for Federal financial assistance.

3. On or before January 31, 1966, the Commissioner of Education may modify the policies respecting desegregation of elementary and secondary schools in order to determine eligibility for Federal financial assistance in the 1966–1967 school year and thereafter.

4. Every school system beginning desegregation must provide for a substantial good faith start on desegregation starting with the 1965–1966 school year, in light of the 1967 target date.

a. Such a good faith start shall normally require provision in the plan that:

(1) Desegregation will be extended to at least four grades for the 1965–1966 school year; the grades covered must include the first and any other lower grade, the first and last high school grades, and the lowest grade of junior high where schools are so organized;

(2) Any pupil newly enrolled in the school system or in any school within the system (e. g., who has newly established a residence within the district) shall be enrolled in and assigned to a particular school without regard to race, color, or national origin;

(3) No pupil shall be publicly supported in a school outside the school district unless such support is available without regard to race, color, or national origin to all pupils residing in the school district; and in any case no student shall be required to attend a school outside the school district in order to maintain racial segregation or minimize desegregation in a school within the district;

(4) Any pupil attending a school to which he was originally assigned on the basis of his race, color, or national origin shall have the right, irrespective of whether or not the grade he is attending has been desegregated, to transfer to another school in order to take a course of study for which he is qualified and which is not available in the school he is attending;

(5) Any student attending any grade, whether or not fully desegregated, at a school to which he originally was assigned on the basis of his race, color, or national origin shall have an opportunity, subject to the requirements and criteria applicable equally to all students without regard to race, color, or national origin to transfer to any other school in which he originally would have been entitled to enroll but for his race, color, or national origin; and

(6) Steps will be taken for the desegregation of faculty, at least including such actions as joint faculty

meetings and joint inservice programs.

b. In exceptional cases the Commissioner may, for good cause shown, accept plans which provide for desegregation of fewer or other grades or defer other provisions set out in 4a above for the 1965–1966 school year, provided that desegregation for the 1965–1966 school year shall extend to at least two grades, including the first grade, and provided that the school districts, in such case, shall take into account the steps which would be required to meet the 1967 target date.

VI. Compliance Reports

A. *General Requirements*. All recipients of Federal financial assistance are subject to the requirements respecting compliance information set forth in section 80.6 of the Departmental Title VI Regulations.

B. *Initial Compliance Report*. If an Initial Compliance Report is required, it shall contain sufficient detailed information to provide an accurate picture of past and present racial conditions in each school district. Precise, up-to-the-minute statistics are not required. The material furnished should be what fair-minded school officials believe to be true and what reasonable men would think necessary for a rational appraisal of racial practices in the system. The following list, not intended to be exclusive, suggests the kinds of information that should be covered by an Initial Compliance Report:

1. A racial breakdown of the school-age population residing in the district by attendance zone;

2. The racial distribution of pupils, by school, throughout the system;

3. The racial distribution of teaching and staff personnel, by school, throughout the system;

4. Maps, which need not be of professional quality, where useful or necessary to demonstrate such things as school locations, attendance zones, or school bus routes;

5. Past and present rules and practices for the initial assignment, reassignment, and transfer of pupils within the system; and

6. The status of appeals or other pending proceedings, if any, if a court order for desegregation is submitted.

C. *Subsequent Compliance Reports*. Subsequently submitted compliance reports may refer to previous reports and should report with the same scope and detail on developments since the last previous report.

VII. Definitions—Initial Assignment, Reassignment and Transfer

As used herein:

A. The term *initial assignment* means the assignment to a particular school in the school system of any pupil who:

1. Is to attend preschool, kindergarten, or first grade; or

2. For the first time enters a school of higher level (such as junior high or high school) after having completed a school of less advanced level; or

3. For the first time enters the school system at any level; or

4. Becomes eligible, or would become eligible, aside from considerations of race, color, or national origin, to attend some other school in the school system by reason of a change of residence.

B. The term *reassignment* means the assignment of a pupil to the school he currently attends for an additional period of time.

C. The term *transfer* means the assignment of a pupil to a school of the same level other than the one he currently attends (e. g., transfer from one elementary school to another).

VIII. Alternative Administrative Procedures

If an administrative procedure provided for herein is not administratively feasible in a particular situation, the Commissioner may accept an alternative procedure if he determines that it will accomplish the same purpose.