Birdie Mae **DAVIS** et al., Appellants,

v.

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY** et al., Appellees.

No. 22759.

United States Court of Appeals
Fifth Circuit.

Aug. 16, 1966.

See also 5 Cir., 333 F.2d 53; 84 S.Ct. 10, 11 L.Ed.2d 26.

Vernon Z. Crawford, Mobile, Ala., Derrick A. Bell, New York City, for appellants.

George F. Wood, Mobile, Ala., for appellees.

Before TUTTLE, Chief Judge, THORNBERRY, Circuit Judge, and LYNNE, District Judge.

TUTTLE, Chief Judge:

This is the fourth appearance of this case before this court. This present appeal, coming as it does from an order of the trial court entered nearly eighteen months ago, on March 31, 1965, points up, among other things, the utter impracticability of a continued exercise by the courts of the responsibility for supervising the manner in which segregated school systems break out of the policy of complete segregation into gradual steps of compliance and towards complete compliance with the constitutional requirements of Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180. One of the reasons for the impracticability of this method of overseeing the transitional stages of operations of the school boards involved is that, under the Supreme Court's "deliberate speed" provisions, it has been the duty of the appellate courts to interpret and reinterpret this language as time has grown apace, it now being the twelfth school year since the Supreme Court's decision. Another is that appellate court requirements have grown more exacting as time has passed, and during the last eighteen months pronouncements of this court have interpreted the Supreme Court's interim decisions as requiring considerably greater measures of desegregation. Thus a decision by a trial court eighteen months ago is not likely to reflect the current law on the subject.[1]

In 1963, the Mobile County schools, both within the city of Mobile and outside the city limits, were completely segregated according to race. In March 1963, the plaintiffs filed this suit to require compliance by the Mobile County School Commissioners with the requirements of Brown v. Board of Education of Topeka. The plaintiffs requested a temporary injunction in order to require a start in desegregating the schools in the fall of 1963. The trial court, after a hearing in May, neither granted nor denied the motion, but granted time for the filing of written briefs. Appellants treated this as an order "denying" an injunction. Cf. United States v. Lynd, 5th Cir., 1962, 301 F.2d 818, and appealed. We held this temporary delay was not an abuse of discretion by the trial court, but stated: "The matter of the grant or denial of the motion for preliminary injunction, should, as in every case, be promptly determined." Davis v. Board of School Commissioners of Mobile County, 5th Cir., 1963, 318 F. 2d 63, 64. We also said: "[T]his court must require prompt and reasonable starts, even displacing the District Court discretion, where local control is not desired, *or is abdicated by failure to promptly act.*" (Emphasis added.) id. p. 64. This was the first appearance of the case in this court.

On remand, the District Court still declined to grant an injunction and set the case for trial in November, thus permitting the tenth year to pass without

---

1. Lest this concept of changing requirements be criticized, we must call attention to the fact that the delaying of full vindication of a person's constitutional rights as was done in the School Desegregation Cases is itself a novel concept, requiring constant reappraisal of the degree of compliance by the school systems. It must also be borne in mind that this school board ignored for nine years the requirement clearly stated in Brown that the School authorities have the primary responsibility for solving this constitutional problem.

any compliance with the constitutional requirements. The order of denial was an appealable order. It was appealed, and a motion for an injunction pending appeal was filed and heard by this court.

On July 9, 1963, this court granted appellant's request for injunction pending appeal, requiring a measure of desegregation to begin in at least one grade for the 1963–64 school year. Davis v. Board of School Commissioners of Mobile County, 5th Cir., 322 F.2d 356. This was the second appearance of the case here.

Upon the approval by the trial court of an initial plan, appellants again appealed to this court, contending that the rate of desegregation of the grades fell short of the current requirements of the decisions by the Supreme Court and this court, and that there had not been a complete abolition of dual zones for white and Negro children. This court reversed the District Court's order approving the plan. We prescribed definite minimum standards and shortened the time eventually desegregating the several grades of the school. Included in the opinion of this court was the requirement that dual school zones, areas, or districts be abolished. By incorporating the language of the opinion in Armstrong v. Board of Education of the City of Birmingham, 5th Cir., 333 F.2d 47, decided the same day, this court said: "The dual or biracial school attendance system, that is, any separate attendance areas, districts or zones, shall be abolished as to each grade to which the plan is applied and at the time of the application thereof to such grades, and thereafter to additional grades as the plan progresses. * * * The plan shall apply to the admission of new pupils coming into the school system for the first time." Id. at 51. Davis v. Board of School Commissioners of Mobile County, 5th Cir., 1964, 333 F.2d 53. This was the third appearance of this case here.

After the mandate from the 1964 decision became the order of the District Court, that court again approved a plan of desegregating the Mobile County schools. Its order approving the Board's plan is now the subject of this fourth appeal. This plan embodies the following principal provisions:

(1) All existing school assignments shall continue without change except when transfers are authorized by the Assistant Superintendent in charge of pupil personnel under the provisions of the plan. (This means that all Negro and white children who had entered Negro and white schools respectively would continue to attend those schools unless transferred.)

(2) Transfers as to the desegregated grades could be applied for between April 1 and April 15 of each year for the next succeeding year. As originally written the transfers were subject to the requirements of the Alabama Pupil Placement Act, having many subjective tests. It is apparent that during subsequent years these tests were not, in fact, resorted to, but transfers were granted or denied largely upon other factors, not announced publicly and not fully specified in this record other than the general ground of the lack of space for the student seeking transfer in the school to which transfer was requested.

(3) New student assignments. New students applying for admission to the first grade or pupils registering for the first time in other grades to which the plan has become applicable "may apply for attendance at the school in the district of their residence, or the nearest school *formerly attended exclusively by their race* at their option."

(4) All faculties of the schools of Mobile County are assigned according to race.

The school population of the Mobile County School System for the year 1964–65 was approximately 75,000 pupils, and for the succeeding year some 79,000. 39% of the school population was Negro and 61% white. Substantially all of the school's buildings were crowded in 1963–64, but a program of building new schools was under way. The record does not disclose the present availability of

seats in any particular school. The school system incorporated some 90 different school buildings at the time of the promulgation of this plan. Information supplied pending the appeal indicates that of the approximately 31,000 Negro students, 39 were attending class with white students during 1965–66.

In order to understand fully the working of the plan, it must be borne in mind, as disclosed upon the trial of the case, that a new map of "school areas" has been prepared by the Board of Education. These school areas are readily distinguishable as "white" and "Negro," although, in each of the areas, there is a sprinkling of persons of the opposite race. The trial court found as a fact, that the area boundaries were not drawn with racial characteristics in mind for the purpose of maintaining a pattern of racial segregation in the area schools.[1a] However, the school superintendent testified (as was obvious to any who studied neighborhood patterns) that it was "generally true that the actual make-up of the school district [sometimes called "area"] tends to conform with the race of the school within that district." It must also be borne in mind that the junior high schools and senior high schools have operated on the "feeder" system, and it is demonstrated on the record that allocation of students to the junior high schools and senior high schools follow the racial pattern because only Negro elementary schools are feeders to the Negro junior high schools, and the latter are the only feeders to the Negro senior high schools. In other words, no Negro elementary school prepared students for a junior high school that was not entirely Negro, and no white elementary school prepared students for a junior high school that was not almost entirely white.[2]

The plan was to have application in the school year 1963–64 to the twelfth grade in the city of Mobile only, in the school year 1964–65 it was to have application to the eleventh and twelfth grades in all schools in Mobile County and to the first and tenth grades in the City of Mobile schools. In 1965–66 it was to have application to grades one, two, nine, ten, eleven and twelve of all schools of Mobile County. In 1966–67, grades three and eight were to be added, in 1967–68, grades four and seven were to be added, in 1968–69 grade five was to be added, and in 1969–70 it became applicable to grade six.

Further factual material that must be noted is that, as found by the District Court, "A larger variety of special courses is offered at those schools attended predominantly by white pupils."[3] The Board has no policy of permitting a Negro student of a grade not yet desegregated to transfer to a white school in order to take a particular course of study.

---

1a. We do not here pass on the correctness of this determination nor determine the legal effect that might result if de facto segregation were to continue by reason of the setting up of school districts even without any improper motive.

2. The Board does not now class schools as white or Negro. However, the use of the designation is meant to convey the fact that the schools of Mobile are still either entirely Negro or almost entirely white.

3. A larger variety of special courses is offered at those schools attended predominantly by white pupils, although in many instances the number of schools offering a particular course is only one more in the case of white pupils. There are about 50% more white pupils in the system than Negro pupils, making it reasonable that more schools attended predominantly by white pupils would offer a particular special subject. Many factors enter into a determination of courses offered in a particular school, and the course offerings vary from school to school without necessary regard to the race of the pupils. Facilities, pupil interest, location, and socio-economic factors all affect course offerings. There is no evidence that any application for transfer for the current year was predicated on a desire for a special course not offered by the school the pupil had been attending. The Assistant Superintendent in charge of pupil personnel could not recall a single such request.

Essentially, it can be said that this plan, operating in a system in which space is tight, and where all students are "frozen" into the segregated pattern of attendance unless transfers are approved, provides little opportunity to break up the heretofore open identification of schools as white and Negro. Recognizing, as we must, the binding effect of the pronouncement in Brown v. Board of Education of Topeka, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873, 38 A.L.R. 2d 1180, that "[s]eparate educational facilities are inherently unequal," we conclude that the Mobile plan falls far short of the requirements of the law in several respects. Principal among these is the fact that even as to those grades which, under the plan, have actually become "desegregated" there is no true substance in the alleged desegregation. Less than two-tenths of one percent of the Negro children in the system are attending white schools. Another defect is in the length of time that the plan would require to come to a final fruition; another is the option given to white students living within the "area" or "district" of a given school to transfer to another district or area to attend a white school there, without the granting of a similar option to a Negro child residing within the area of a Negro school to transfer to a white school outside the area; a further significant defect is the lack of provision for a Negro child to attend a school offering particular subjects if such subjects are taught only in white schools; and finally, there is the failure of the plan to start desegregation of the faculties of the schools.

Both in the testimony and in the briefs, much is said by the appellees about the virtues of "neighborhood schools." Of course, in the brief of the Board of Education, the word "neighborhood" doesn't mean what it usually means. When spoken of as a means to require Negro children to continue to attend a Negro school in the vicinity of their homes, it is spoken of as a "neighborhood" school plan. When the plan permits a white child to leave his Negro "neighborhood" to attend a white school in another "neighborhood" it becomes apparent that the "neighborhood" is something else again. As every member of this court knows, there are neighborhoods in the South and in every city of the South which contain both Negro and white people. So far as has come to the attention of this court, no Board of Education has yet suggested that *every* child be required to attend his "neighborhood school" if the neighborhood school is a Negro school. Every board of education has claimed the right to assign every white child to a school other than the neighborhood school under such circumstances. And yet, when it is suggested that Negro children in Negro neighborhoods be permitted to break out of the segregated pattern of their own race in order to avoid the "inherently unequal" education of "separate educational facilities," the answer too often is that the children should attend their "neighborhood school."

So, too, there is a hollow sound to the superficially appealing statement that school areas are designed by observing safety factors, such as highways, railroads, streams, etc. No matter how many such barriers there may be, none of them is so grave as to prevent the white child whose "area" school is Negro from crossing the barrier and enrolling in the nearest white school even though it be several intervening "areas" away. This court, in a number of decisions, notably Singleton v. Jackson Municipal Separate School District, 5th Cir., 355 F.2d 865, and Price v. Denison Independent School District, Board of Education, 5th Cir., 348 F.2d 1010, has called attention to the significant fact that the United States Congress, in passing the Civil Rights Act of 1964, declared a strong legislative policy against racial discrimination in public education.[4] The operative section of the statute expressly pro-

4. Act of July 2, 1964, Public Law 88–352, Title IV, §§ 401–410, 78 Stat. 246–249, 42 U.S.C.A. §§ 2000c to 2000c–9.

hibits the exclusion of any person in the United States from participation in being denied the benefits of, or being subjected to discrimination under, any program or activity receiving federal financial assistance.[5]

We have also called attention to the publication by the Department of Health, Education and Welfare of a "General Statement of Policies Under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools." [6] We now call attention to the fact that a revised statement of policies has been issued by the Department as of March 1966.

In Singleton v. Jackson Municipal Separate School District, 5th Cir., 348 F.2d 729, this court said:

"We attach great weight to the standards established by the Office of Education. The judiciary has of course functions and duties distinct from those of the executive department, but in carrying out a national policy the three departments of government are united by a common objective. There should be a close correlation, therefore, between the judiciary's standards in enforcing the national policy requiring desegregation of public schools and the executive department's standards in administering this policy. Absent legal questions, the United States Office of Education is better qualified than the courts and is the more appropriate federal body to weigh administrative difficulties inherent in school desegregation plans. If in some district courts judicial guides for approval of a school desegregation plan are more acceptable to the community or substantially less burdensome than H.E.W. guides, school boards may turn to the federal courts as a means of circumventing the H.E.W. requirements for financial aid.

Instead of a uniform policy relatively easy to administer, both the courts and the Office of Education would have to struggle with individual school systems on ad hoc basis. If judicial standards are lower than H.E.W. standards, recalcitrant school boards in effect will receive a premium for recalcitrance; the more the intransigence, the bigger the bonus. * * *

"If Selma, Alabama, can commence with desegregation of four grades for 1965–1966, Jackson, Mississippi, can at least catch up. And indeed in all but the most exceptional cases, all school districts commencing desegregation in fall 1965 should be expected to do as well."

After having made this pronouncement, this court granted an injunction pending appeal and directed the Board of Education of the City of Jackson, Mississippi "to submit promptly a plan of desegregation extending to at least 4 grades for the year 1965–1966." With respect to this, the court then said: "As to details of the plan, *the Board should be guided by the standards and policies announced by the United States Office of Education in establishing standards for compliance with the requirement of Title VI of the Civil Rights Act of 1964.*" In Price v. Denison Independent School District Board of Education, 5th Cir., 348 F.2d 1010, this court said: "In Singleton v. Jackson Municipal Separate School Dist., * * * we accorded these minimum standards a high place in our future handling of school cases *totally without regard to whether a school district was seeking (or desired) Federal grants in aid.*" (Emphasis added) 348 F.2d 1010, 1013. Then, in the later case of Singleton v. Jackson Municipal Separate School District, 5 Cir., 355 F.2d 865, we restated the same principle of attaching great weight to the standards established

---

5. 42 U.S.C.A. § 2000d provides as follows: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

6. 45a C.F.R. Section 80(c), December 4, 1964, Pursuant to Section 602 of the Act, 42 U.S.C.A. Section 2000d–1.

by the Office of Education. We said: "HEW's statement of April, 1965 establishes only *minimum* standards of general application. In certain school districts and in certain respects, HEW's standards may be too low to meet the requirements established by the Supreme Court and by this Court; *we doubt that they would ever be too high.*" (Emphasis added.) 355 F.2d 865, 869.

Then, dealing with the specific provisions of the Jackson plan, this court said: "The school children in still-segregated grades in Negro schools are there by assignment based on their race. This assignment was unconstitutional. They have an absolute right, as individuals, to transfer to schools from which they were excluded because of their race.

"This has been the law since Brown v. Board of Education [of Topeka], 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 [38 A.L.R.2d 1180]. Misunderstanding of this principle is perhaps due to the popularity of an oversimplified dictum that the constitution 'does not require integration' [Briggs v. Elliott, E.D.S.C., 1955, 132 F.Supp. 776, 777]. But there should be no misunderstanding now as to the right of any child in a segregated class to transfer to a formerly all 'white' class, regardless of the slow pace of systematic desegregation by classes." Then pointing to the case of Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265, the opinion showed that, as required by that decision of the Supreme Court, it will hereafter be required that, where assignments of pupils were on a racial basis, they must now be permitted to attend the school from which they were originally excluded because of race. Thus, a Negro child living in area "A" which was predominantly white who was assigned to a Negro school in area "B", and who is still in attendance at the Negro school by reason of continuing attendance where originally assigned, is constitutionally entitled to an immediate transfer to the school from which he was denied admission, but which he would have been entitled to attend if of the other race. We find this to be clearly the

holding of the Supreme Court in Rogers v. Paul.

Not only did this court spell out this requirement in the *Singleton* case, but during the summer of 1965, upon motion made on behalf of Negro plaintiffs, we entered seven per curiam orders in other cases remanding to the District Court "for further consideration in the light of Singleton v. Jackson Municipal Separate School District * * *." 349 F.2d 1020, 1022.

Thus, for many a year, it has been apparent to all concerned that the requirements of Singleton and Denison were the minimum standards to apply.

■ Thus it is, that regardless of the number of grades which, beginning next fall, are under the plan of desegregation, the appellee Board must grant to any child whose original attendance at his present school was dictated by the policy of segregating children by race (as was done uniformly prior to September, 1963), the right, at his request, to attend the school which he would have been permitted to attend but for such racial policy.

■■ All other pupils, that is, those who have entered their present schools without reference to racial attendance policies, were given the option of attending the school of their "area" (unmistakably identifiable as either a Negro or white "area") or the nearest school, outside the area, *formerly predominantly of their race.* Since it is perfectly obvious that this was a choice which permitted white students in a Negro "area" to transfer to the nearest white school, which privilege was not granted to entering Negro students, this is a plain violation of one oft-repeated requirement that dual school zones must be abolished. We conclude therefore that all of such Negro students who have entered under this policy must be accorded a similar choice. That is, they must be given the opportunity of remaining in the Negro school of their area or transferring to the nearest white school. Then, if any students who hereafter enter the system

are given the blanket option of choosing the nearest white school rather than the Negro school of the area in which they reside, as is now the plan, this option must be afforded to all, Negro as well as white. Otherwise, this device has the effect of perpetuating the separation of pupils into the Negro and white schools. Such separation of classes by race is the thing that is condemned in Brown v. Board of Education of Topeka. Its perpetuation cannot be condoned on the theory that the Negro child is given the privilege of transferring out of his area into another Negro school and the white child is given the right to transfer out of his area into a white school.

■ If the optional transfers we have here prescribed should overcrowd the white schools, then preference must be given to the pupil living nearest the school. See Gaines v. Doughtery County Board of Education, 5th Cir., 329 F.2d 823, 825.

■ Furthermore, in light of the specific requirements announced by the Supreme Court in Rogers v. Paul, supra, every consideration must be given by the Board to make possible the transfer of any Negro pupil to another school which provides a course of instruction which he desires to take, and which is not included in the curriculum of the school to which the "area" assignment practice places him.

Another panel of this court is considering appeals in eight other school desegregation cases. In all of these, the court has asked for briefs touching on the extent to which the courts could, and, if they can, should, give weight to, or rely on, H.E.W. guidelines and policies in cases now before the court.[7] Because this case was then pending, we also called on counsel to respond to these questions in this case.

All of the cases referred to were argued orally and submitted to the court on May 24th. The present appeal was submitted to a different panel earlier. In none of the other cases is there involved a large metropolitan school district as is the case here. We are reluctant to wait any longer to permit the court fully to resolve all of the questions raised in the other appeals before announcing our conclusion as to minimum changes that must be put into effect by the appellee Board of School Commissioners from Mobile County for the next school year. We conclude that the requirements we have outlined are absolutely essential in order for this court's judgments to be consistent as we approach the twelfth year following the Supreme Court's decision in Brown v. Board of Education of Topeka.

■ In addition, two further modifications of the Mobile plan must be made. The first is that the time must be shortened in such manner that all grades will be fully desegregated by the beginning of school in the fall of 1967, the target date announced in the H.E.W. regulations. There is nothing on the record before us that demonstrates the need for any additional time under the formula announced in the Brown decision.

■ Second, the plan must be modified in order that there be an end to the present policy of hiring and assigning teachers according to race by the time the last of the schools are fully desegregated for the school year 1967–68.

As has already been stated, the actual supervision by the courts, especially an appellate court, of the steps by which the constitutional rights of the plaintiffs and

---

7. These questions, submitted to counsel were:
    (a) To what extent, consistent with judicial prerogatives and obligations, statutory and constitutional, is it permissible and desirable for a federal court (trial or appellate) to give weight to or to rely on H.E.W. guidelines and policies in cases before the court?

(b) If permissible and desirable, what practical means and methods do you suggest that federal courts (trial and appellate) should follow in making H.E.W. guidelines and policies judicially effective?

their class are ultimately vindicated is highly unsatisfactory. The degree to which the appellee accepts the legal principles announced by the courts as the guiding principles upon which it undertakes anew the task of operating a constitutionally valid school system, the simpler and more professionably acceptable to all will it be. As the Supreme Court and this court develop and announce additional legal principles affecting the "deliberate speed" principle, the Board should be guided accordingly. If it fails to do so, the trial court, under the doctrine of stare decisis, will be able to solve such additional questions as may arise in the application of the legal principles involved.

In order that the trial court may promptly enter an order making, or approving, modifications in the plan to conform to what is said here, the order of the trial court is reversed and the case is remanded.

The judgment shall issue forthwith.

LYNNE, District Judge, having recused himself, took no part in the hearing, consideration, or decision of this case.