## EDUCATION

**PUBLIC SCHOOLS – DESEGREGATION – MEANING OF STATE BOARD OF EDUCATION REGULATION REQUIRING PLANS TO ATTAIN "RACIAL BALANCE" BETWEEN SCHOOL FACULTY AND STAFF AND THE SURROUNDING POPULATION**

August 20, 2014

*Michael J. Martirano, Ed.D.*
*Superintendent, St. Mary's County Public Schools*

Counsel to the Board of Education of St. Mary's County ("County Board"), on your behalf and on behalf of the County Board, asked whether a 1970 school-integration regulation promulgated by the State Board of Education ("State Board") remains a valid, enforceable requirement of State law. The regulation at issue—which we will refer to as the "Integration Rule"—applies to the "hiring, placement, and promotion of all personnel" and directs county boards to develop and implement plans and procedures "for the attainment of racial balance, at the various levels of the public school system, reflective of the population of their respective jurisdictions" and to submit those documents to the Maryland State Department of Education ("MSDE") by January 1, 1971. COMAR 13A.07.05.01. The regulation also directs MSDE to "require and review reports from local boards on the implementation of this regulation."

It is our understanding that the County Board's opinion request was prompted by a complaint that the St. Mary's County Branch of the National Association for the Advancement of Colored People ("NAACP") filed with the County Board alleging that the County Board was not currently in compliance with the racial balancing requirements in the regulation. After the County Board and Superintendent requested this Opinion, the NAACP submitted comments on the continuing viability and applicability of the regulation. And, on our request, MSDE conducted a search of its records to find information that might shed light on the intent of the State Board, which adopted the rule by resolution in the summer of 1970.

At the outset, we note that the Integration Rule, in plain terms, requires the County Board to take two sets of actions: (1) to submit its "plans and procedures" for attaining racial balance by January 1, 1971, and (2) to implement those plans and

procedures. Your question does not relate to the first requirement. Although none of the entities involved in this process has been able to locate the plan the County Board submitted more than forty years ago, no one suggests that the County Board failed to *submit* the required plan. The real question here is the continuing viability of the second requirement, the obligation to *implement* the plan. We see that question as a general one, not focused on any particular measure that the County Board might have included in its 1971 plan. We therefore will address only the broad question that you have posed: whether the Integration Rule required the County Board to adopt, and requires the County Board to implement, employment policies that would be vulnerable to challenge under the current law on the use of racial classifications in employment.

In developing our opinion on the question you raise, we have had the benefit of two thorough and thoughtful analyses of the history of school desegregation and how it relates to the development and application of the Integration Rule. Counsel to the County Board expressed the view that the rule required only a one-time plan submission and that, if the rule were interpreted as imposing a continuing requirement of mathematical racial balance, it would be unconstitutional in light of the significant developments in anti-discrimination law that have occurred since 1970, particularly the Supreme Court's open disapproval of "racial balancing" as a policy goal. *See*, *e.g.*, *Fisher v. University of Texas at Austin*, 133 S.Ct. 2411, 2419 (2013) (describing "racial balancing" as "patently unconstitutional"); *Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake"). The St. Mary's County Branch of the NAACP, in its response, stated that it saw the Integration Rule as not about "the absence or presence of plans and procedures . . . submitted by a date certain," but about requiring local boards to use their "professional skill and creativity" to develop general policies relating to faculty recruitment, retention, and promotion "that do not run afoul of the equal protection of individuals in its school system." NAACP, St. Mary's Branch, Response to Maryland Attorney General on COMAR 13A.07.05.01 at 1, 7 (April 16, 2012).

We conclude that, although the text of the Integration Rule is ambiguous as to what achieving "racial balance" might mean, the State Board's statements about the types of employment practices needed to achieve equity in a particular local school system—made just two weeks before it adopted the Integration

Rule—indicate that the rule was not intended to remedy past discrimination through the establishment of an employment quota for any racial group. Although our conclusion on this point differs somewhat from that set forth in the only published decision to mention the rule, *see Vaughns v. Board of Educ. of Prince George's County*, 742 F. Supp. 1275 (D. Md. 1990), we believe the historical record that we have been able to uncover demonstrates that the rule looks forward, not backward. The State Board intended the rule to require local boards of education to adopt and report on nondiscriminatory and inclusive employment policies—including efforts to recruit, retain, and promote qualified minority teachers, administrators, and other staff—that would promote diversity, foster cultural under-standing, and set the conditions for a lasting integration of Maryland's public schools.

It is further our opinion that the Integration Rule, so construed, is valid under current law. Therefore, a local school board plan that in 1971 set continuing policies of nondiscriminatory and inclusive employment may still be implemented to achieve the purposes of the Integration Rule, and MSDE may still require reports; the rule remains on the books as an MSDE regulation. As we will explain below, however, MSDE has since developed more detailed approaches to promoting minority employment to pursue the promises of *Brown v. Board of Education* within the framework of the Supreme Court's more recent pronouncements on the permissible use of racial classifications in the fields of employment and education. We defer to MSDE and the State Board on the matter of what actions, if any, its current diversity and equal employment opportunity policies require of local boards.

# I

## Background

The Integration Rule was originally adopted on July 29, 1970, as one of three bylaws approved by the State Board to deal with racial integration of Maryland's public schools. The regulation remains in the same form as when promulgated more than forty years ago:

> .01 Integration.
>
> Local boards of education shall develop and implement plans and procedures for the attainment of racial balance at the various levels of the public school system, reflective

> of the composition of the population of their respective jurisdictions. These plans and procedures shall apply to the hiring, placing, and promotion of all personnel employed at the various levels of the school system. The plans and procedures provided in this regulation shall be submitted to the State Department of Education by January 1, 1971. The Department shall also require and review reports from local boards on the implementation of this regulation.

COMAR 13A.07.05.01.

Because the Integration Rule itself gives no instruction on the methods by which county boards were to carry out its purpose, we have turned to the context in which the State Board adopted it, and particularly to the State Board's consideration, while it was formulating the rule, of two other issues involving the integration of staff through equitable employment practices. The issues addressed by the State Board in 1970 are in turn best understood in the wider frame of school desegregation in Maryland since *Brown*, and so we begin by sketching a summary, by no means exhaustive, of the parts of that history that will most aid in our construction of the rule.[1]

## A. *School Desegregation in Maryland: A Brief History*

### 1. Desegregation from 1954-64

When the Supreme Court issued its landmark decision in *Brown v. Board of Education*, 347 U.S. 483 (1954) ("*Brown I*"), Maryland was one of seventeen states that, by law, required separate public schools for white and Black students. Md. Ann. Code, art. 77, §§ 124, 207-08 (1951). *Brown I* declared that state action in establishing or maintaining racially separate schools was unconstitutional because it denied minority students the equal protection of the law guaranteed by the Fourteenth Amendment:

---

[1] For an interesting and illuminating account of segregation in St. Mary's County, see *In Relentless Pursuit of an Education: African American Stories from a Century of Segregation (1865-1967)* (Unified Committee for Afro-American Contributions of St. Mary's County, Inc., ed. 2006).

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." 347 U.S. at 495.

A year later, in *Brown II*, the Court considered the manner in which the defendant school systems were to "transition to a system of public education freed of racial discrimination." *Brown v. Board of Educ.*, 349 U.S. 295, 299 (1955) ("*Brown II*"). The Court did not prescribe any particular method for desegregating the schools, but instead directed local officials to fashion their own plans addressing the particular problems that existed in each local school system. Under *Brown II*, courts reviewing the actions of local school systems were to "consider the adequacy of any plans [that school officials] . . . may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system." *Id.* School systems were ordered to make a "prompt and reasonable start" toward desegregation, *id.* at 300, and to move forward with "all deliberate speed." *Id.* at 301.

So, with *Brown II*, each local school system in 17 states became responsible for creating, based on local circumstances, its own plan to dismantle its racially segregated system and to begin operating its public schools without regard to race. The resulting patchwork of desegregation plans varied widely, not only from state to state but also within each state; they differed not only in method but perhaps even more notably in pace, as *Brown II* provided neither a definite timetable for eliminating the effects of prior racial segregation nor a clearly defined end point.[2]

---

[2] Justice Powell described the uncertainty that existed following *Brown I* and *II*:

> The great contribution of *Brown I* was its holding in unmistakable terms that the Fourteenth Amendment forbids state-compelled or state authorized segregation of public schools. 347 U.S., at 488, 493-495. Although some of the language was more expansive, the holding in *Brown I* was essentially negative: It was impermissible under the Constitution for the States, or their instrumentalities, to force children to attend segregated schools. The forbidden action was *de jure*, and the opinion in *Brown I* was construed—for some years and by many courts—as requiring only state neutrality,

In Maryland, the immediate legal consequence of the *Brown* decisions was that all State constitutional and legislative acts requiring segregation were rendered "nullities" and that State and local school authorities acquired an immediate legal duty to begin efforts to comply with the Supreme Court's mandate. *See* 40 *Opinions of the Attorney General* 175, 176 (1955) (describing the effect of the *Brown* holdings on State law). Nonetheless, five years after *Brown II*, one third of the school systems in Maryland had not even begun to desegregate; as of fall 1960, approximately two thirds of Maryland's public schools had admitted no African-American students at all.[3]

In Maryland, as in other states required to dismantle racially segregated schools, a number of school systems initially adopted "freedom of choice" plans. Under this kind of plan, typically one or two grade levels each year would be opened to both Black and white students, but only those students who requested transfers out of their formerly one-race schools would be considered for reassignment to a different school. *See*, *e.g.*, *Robinson v. Board of Educ. of St. Mary's County*, 143 F. Supp. 481, 491 (D. Md. 1956) (describing freedom of choice plans in other districts); *see also Board of Educ. of St. Mary's County v. Groves*, 261 F.2d 527, 528-29 (4th Cir. 1958) (describing plan of "gradual integration" beginning with voluntary transfers to elementary schools in 1957 and some high school grades in 1959); *Pettit v. Board of Educ. of Harford County*, 184 F. Supp. 452, 453-54 (1960) (describing Harford County's voluntary transfer plan for desegregation). Because these plans typically did little or nothing to encourage Black students to seek a transfer to a formerly all-

allowing "freedom of choice" as to schools to be attended so long as the State itself assured that the choice was genuinely free of official restraint.

*Keyes v. School District No. 1*, *Denver*, *Colorado*, 413 U.S. 189, 220 (1973) (Powell, J., concurring in part and dissenting in part).

[3] The State Board's minutes of February 22, 1961, note: "Each member of the Board was given a copy of a report on the '*Status of Desegregation in Former White Maryland Public Schools*' for the period of the fall of 1955 through the fall of 1960. In the fall of 1960 there were 34,148 colored pupils in 362 of the State's 1,025 public schools. Eight of the 24 school systems as yet have no desegregated schools; however, no school system has indicated an unwillingness to desegregate."

white school, or white students to transfer to a formerly all-Black school, in many cases "freedom of choice" plans did not lead to significant changes in the school attendance patterns that had been created under segregation. *See*, *e.g.*, *Christmas v. Board of Educ. of Harford County*, 231 F. Supp. 331, 333 (D. Md. 1963) (stating that of 2,100 Black students in that system, 1,600 remained in all-Black schools); *Vaughns v. Board of Educ.*, 355 F. Supp. 1034, 1035 (D. Md. 1972) ("During the 1964-65 school year, the last year in which the 'freedom of choice' plan was in operation, over 82% of the [Prince George's] County's black student population attended schools which were 100% black and over 73% of the white students attended schools which were over 95% white.").

Partly in response to the distressingly slow early pace of school desegregation, Congress enacted Titles IV and VI of the Civil Rights Act of 1964.[4] The two provisions "together constitute[d] the congressional alternative to court-supervised desegregation" and thus represented "a congressional mandate for change—change in the pace and method of enforcing desegregation." *U.S. v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 849, 852 (5th Cir. 1966). Under Title VI, federal funds made available to local school systems were withheld from any system that continued to discriminate on the basis of race in violation of the Fourteenth Amendment.[5] To administer the Title VI program, the Act created the Office of Civil Rights within the U.S. Department of Health, Education, and Welfare ("HEW") and authorized the U.S. Commissioner of Education to monitor local school systems and award funds on the basis of compliance with the Act. In accordance with those provisions, HEW's Office of Civil Rights issued in December 1964 its first set of regulations on the conditions to be met for funding. Non-Discrimination in Federally-Assisted Programs, 29 Fed. Reg. 16298 (Dec. 4, 1964) (codified at 45 C.F.R. §§ 80.1 *et seq.*); *see also Price v. Denison Indep. School Dist. Bd. of Educ.*, 348 F.2d 1010, 1013 (5th Cir. Tex. 1965) (describing the regulations).

---

[4] Act of July 2, 1964, Pub.L. 88-352, Title IV, §§ 401-410, 78 Stat. 246-249, 42 U.S.C. §§ 2000c to 2000c-9; Title VI, § 601, 78 Stat. 252, 42 U.S.C. § 2000d.

[5] Section 601 of the Civil Rights Act provides: "No person in the United States shall, on the ground of race, color, or natural origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

While the enactment of Title VI "mobilize[d] in aid of desegregation the United States Office of Education and the Nation's purse," *Jefferson County*, 372 F.2d at 849-50, Title IV empowered the U.S. Attorney General to bring civil enforcement actions to require desegregation of dual school systems. Thus, as a consequence of Titles IV and VI, from the mid-1960s the other branches of the federal government began working alongside the federal courts as additional engines driving local school systems to desegregate.[6]

### 2. Desegregation from 1965-70

In addition to the federal government's expanded role, the mid-1960s also brought greater clarity as to what was required of a local school system in order to eliminate the effects of prior discrimination. For most jurisdictions, ending racial discrimination in the assignment of pupils was deemed the largest and most pressing administrative challenge. Implementation of issues perceived to be secondary—such as the assignment of teachers on the basis of race—was frequently deferred. *Christmas*, 231 F. Supp. 333 (noting that from 1957 to 1964 the county school system had neither hired any Black teachers for, nor assigned any to, "the formerly white, now desegregated schools").

In 1965, the Supreme Court dispelled the idea that desegregating the public schools' professional staff could be deferred as a secondary obligation. First, in *Bradley v. School Board of Richmond*, 382 U.S. 103 (1965), the Court held that courts could no longer approve school desegregation plans without considering "the impact on those plans of faculty allocation on an alleged racial basis." *Id.* at 103. The Court also declared that "[d]elays in desegregating school systems are no longer tolerable." *Id.* at 105. Six weeks later, in *Rogers v. Paul*, the Court held that students who were not yet in desegregated grades "plainly" had legal standing to challenge the racial allocation of faculty on the theory that "racial allocation of faculty

---

[6] For a more detailed chronology of the sequence of the enactment of the Civil Rights Act, President Johnson's executive orders, HEW's promulgation of its Title VI regulations and policies, and the enactment of the Elementary and Secondary Education Act of 1965, which significantly increased federal aid to schools—and thus the incentive to comply with Title VI— see *Jefferson County*, 372 F.2d at 850-51.

denies them equality of educational opportunity without regard to segregation of pupils." 382 U.S. 198, 200 (1965).

Just as the federal courts were beginning to include school faculty and staff within the desegregation mandate, HEW also began to require local school systems to include within their desegregation plans measures designed to desegregate staff. The regulations that HEW had adopted in late 1964 outlined three separate ways in which school systems could qualify for federal funds: (1) submit an Assurance of Compliance (for systems that never practiced segregation, or had successfully desegregated); (2) operate under a court-ordered desegregation plan; or (3) desegregate under a "voluntary plan" approved by HEW. *See* 29 Fed. Reg. at 16300. In April 1965, HEW's Office of Civil Rights issued policies on the desegregation of public elementary and high schools, which identified the subjects that school systems were to address in their voluntary plans. As to faculty and staff assignments, HEW's Policy Statement gave these broad instructions:

> *Faculty and staff desegregation.* All desegregation plans shall provide for the desegregation of faculty and staff in accordance with the following requirements:
>
> a. *Initial assignment*. The race, color, or national origin of pupils shall not be a factor in the assignment to a particular school or class within a school of teachers, administrators or other employees who serve pupils.
>
> b. *Segregation resulting from prior discriminatory assignments*. Steps shall also be taken toward the elimination of segregation of teaching and staff personnel in the schools resulting from prior assignments based on race, color, or national origin . . . .

Office of Educ., U.S. Dep't of Health, Educ. & Welfare, General Statement of Policies Under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools, § V(B)(1) (1965) (reproduced at *Price*, 348 F.2d at 1016). The HEW also pressed school systems to accelerate the pace of desegregation. In its policy statement it set "the fall of 1967 as the target date for total desegregation for applicant school systems . . . ." *Price*, 348 F.2d at 1013.

Maryland schools took steps to cooperate with HEW in carrying out the desegregation mandate. The Maryland State Board of Education adopted a resolution to comply with Title VI "and all requirements imposed by or pursuant to the regulations of [HEW] . . . ." State Board Resolution No. 1965-15 (Feb. 24, 1965). Also beginning in 1965, HEW representatives met individually with most of Maryland's 24 local school systems to advise them of HEW's desegregation regulations, inform them that the freedom-of-choice policy would not be approved beyond the school year 1967-68, and discuss the desegregation plan they were required to submit beginning with the 1966 school year. Minutes of the State Board of Education (March 30, 1966) at 2465. The State Board's minutes indicate that "[State Superintendent] Dr. Sensenbaugh informed the Board that guidelines for the Civil Rights Act of 1964 have been received by school systems in the State and they have been asked by the U.S. Office of Education to develop a program of desegregation that will meet the requirements of the U.S. Office." *Id.*

Despite the additional impetus toward desegregation provided by the 1964 Civil Rights Act, and by HEW in particular, as of the mid-1960s desegregation in some parts of Maryland and in many states remained far behind where the courts had anticipated it should be a decade after the *Brown* decisions. As of 1965, for example, the Fifth Circuit noted that no faculty desegregation at all had occurred in Alabama, Louisiana, and Mississippi. *See Jefferson County*, 372 F.2d at 853-54 (noting that "none of the 30,500 Negro teachers in Alabama, Louisiana, and Mississippi served with any of the 65,400 white teachers in those states"). Of the 99 court-approved "freedom of choice" plans in the Fifth Circuit, 79 did not even include provisions on faculty desegregation. *Id*. at 861 n.52.[7] In 1966, the *Jefferson County* court related, less than 1% of Black students in Alabama, Mississippi, and Louisiana were attending desegregated schools, and "the entire region encompassing the Southern *and border states* [including Maryland] had 10.9 per cent of their Negro children in school with white children." *Id*. at 854 (emphasis in the original).

---

[7] In 1967, the U.S. Commission on Civil Rights issued a report titled "Racial Isolation in the Schools," which documented the lack of progress since *Brown* in desegregating southern schools.

Some counties in Maryland were significantly ahead of this pace. However, as late as 1966, many of the State's school systems had yet to make major changes in the numbers of students attending bi-racial schools. For the 1966-67 school year, HEW ordered 18 of Maryland's 24 school systems to submit voluntary desegregation plans. Early in 1966, the Maryland State Advisory Committee to the U.S. Commission on Civil Rights had published a study on the progress made thus far in 14 of those 18 jurisdictions, more than a decade since *Brown II*. *See* "Report on School Desegregation in 14 Eastern Shore and Southern Maryland Counties" (Feb. 1966). As the data in that Report suggest, for a number of counties, achieving complete desegregation by 1970 would require a decisive acceleration in the process over the ensuing three years.

To offer one example, the desegregation plan for St. Mary's County that was in place in 1966 provided for "freedom of choice" at the elementary and junior high levels, the closing of two all-Black high schools, and assignment of students to the remaining schools solely according to geography. *Id*. at 37. As of the time of the Report, however, few if any of St. Mary's County schools were truly integrated. According to the Report, the public school system in St. Mary's County at that time comprised 21 schools with 8,053 students—5,858 white and 2,195 Black. *Id*. at 36. Fifteen schools were described as "desegregated" and were attended by 945 Black students. Six schools (3 all-white and 3 all-Black) had not been desegregated, meaning that 1,250 Black students—or more than 50% of all Black students—still attended completely segregated schools. *Id*.

The desegregation of faculty, too, had barely begun. St. Mary's had reported a total of 362 teachers and principals employed by the school system, of whom 87 were Black. Five of the 87 Black teachers or principals were said to be on "biracial staffs," leaving 82 of the 87 segregated from their white faculty peers, most likely at schools attended either exclusively or overwhelmingly by Black students.[8]

---

[8] A number of other counties in Maryland followed a similar pattern. *See*, *e.g*., *Christmas*, 231 F. Supp. at 333 (observing that in Harford County no faculty desegregation had occurred as of 1964); *see also* MSBE Resolution No. 1968-11, attached to Minutes of the State Board of Education (Feb. 28, 1968) (approving the Somerset County School Reorganization Plan, which provided for certain changes to be completed by Fall 1970, and stating that, "Faculty integration, which

For those school systems that had yet to fulfill their obligations under *Brown I* and *II*, the Supreme Court's 1968 decision in *Green v. County School Board of New Kent County*, 391 U.S. 430 (1968), signaled that gradual progress was no longer enough. In *Green*, the Court considered whether a "freedom-of-choice" plan was an adequate desegregation remedy where, after three years in operation, only 15% of the African-American students in the system had transferred to the formerly all-white school and no white students had transferred to the Black school. *Id*. at 441. The school board contended that it had fulfilled its constitutional obligation to desegregate by adopting a plan that allowed every student, regardless of race, to freely choose which of the school district's two schools he or she wanted to attend. *Id*. at 437. The board further claimed that its plan "may be faulted only by reading the *Fourteenth Amendment* as universally requiring 'compulsory integration,'" which the board insisted "the wording of the Amendment will not support." *Id*.

Rejecting these contentions, the Court in *Green* reaffirmed that school boards "operating state-compelled dual systems were . . . clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id*. at 437-38. The Court then gave specific directions on what school boards were obligated to do: they were to eliminate all aspects of school operations that had been made racially identifiable under segregation—the student body, faculty, staff, transportation, extracurricular activities, and facilities. *Id*. at 435.

Thus, in 1968, the Supreme Court made clear, with particularity, that a school board had not fulfilled its constitutional duty to eliminate its dual system "root and branch" until no area of school operations, including the racial mix of its student body, faculty, or staff, marked a particular school as formerly all-white or all-Black.[9] If a "freedom-of-choice" plan would not produce that level of actual integration, it failed as a remedy for past

---

has been begun, will be substantially expanded in 1969 with both white and Negro teachers being affected.").

[9] To the same effect, the revised Policies that HEW issued in March 1968 stated: "Compliance with the law requires integration of faculties, facilities, and activities, as well as students, so that there are no Negro or other minority group schools and no white schools—just schools." 33 Fed. Reg. 4955, 4956 (March 18, 1968).

discrimination and so could no longer be approved: "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." *Id*. at 439 (emphasis in original).

In 1969, the Court repeated that message of urgency in *Alexander v. Holmes County Board of Education*, 396 U.S. 19 (1969). In *Alexander*, decided October 29, 1969, the Supreme Court vacated an appellate court order allowing certain school systems additional time—until the next school term—in which to desegregate. *Id.* at 20. The Court pointedly refused to accept any further delay, stating that the time for "all deliberate speed" had run out. *Id*.

On December 1, 1969, the Fifth Circuit effectuated that mandate in its consolidated review of another group of school desegregation orders that had been issued by various lower courts. *See Singleton v. Jackson Municipal Separate School Dist.*, 419 F.2d 1211, 1216 (5th Cir. 1969) (en banc) (stating that, under *Alexander*, the "new modus operandi is to require immediate operation as unitary systems"). The Fifth Circuit ordered that, within two months, every defendant school board was to assign "the principals, teachers, teacher aides and other staff who work directly with children at a school" in such a way "that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students." *Id.* at 1217-18. Then, articulating what came to be known as the "*Singleton* rule," the Fifth Circuit ordered: "For the remainder of the 1969-70 school year the district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." *Id.* at 1218; *see also*, *e.g.*, 36 Fed. Reg. 11769 (June 18, 1971) (HEW description of the "Singleton rule").

On the next day, the Fourth Circuit applied substantially the same rule in *Nesbit v. Statesville City Board of Education*, also a group of consolidated cases, when it directed lower courts to include the integration of faculty in their desegregation orders. 418 F. 2d 1040 (4th Cir. 1969). The Fourth Circuit specifically required that "the ratio of Negro and white faculty members of each school shall be approximately the same as the ratio throughout the system." *Id*. at 1042. The Supreme Court later approved desegregation plans using this same formula in *United States v. Montgomery County Board of Education*, 395 U.S. 225 (1969), and again in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971). However, neither HEW nor the

federal courts mandated that school boards achieve any particular level of system-wide minority employment solely as an element of the desegregation remedy.

From this general survey of school desegregation before 1970, it is worth highlighting several developments that helped to set the conditions for the State Board's adoption of integration guidelines in July 1970. First, the desegregation process occurred unevenly in Maryland, such that large-scale changes in student attendance and faculty assignments in some systems occurred only in the late 1960s. Second, the *Singleton* rule, applied by both HEW and the federal courts as a standard part of the desegregation remedy, sought to achieve a balance in the racial distribution of faculty and staff among the schools in a particular school system, but did not otherwise address minority employment levels within the system as a whole or the racial mix of faculty and staff. *See*, *e.g.*, *Morton v. Charles County Bd. of Educ.*, 520 F.2d 871, 872-73 (4th Cir. 1975) (looking at whether "the ratio of black and white faculty members in each school" did not vary by more than 25% from the system-wide ratio). And finally, with the Supreme Court's decisions in *Green* and *Alexander*, the gradualist phase of school desegregation had come to an end; in the words of the *Singleton* court, the Supreme Court had "sent the doctrine of deliberate speed to its final resting place." *Singleton*, 419 F. 2d at 1216. By 1970, no "racially identifiable" school could be legally maintained in a state where racial segregation had formerly been imposed by law.

### B. The State Board's Promulgation of the Integration Rule in 1970

According to State Board minutes, the Superintendent of Schools advised the Board in February 1970 that the formal, tangible aspects of desegregation had largely been accomplished in Maryland, and what remained was the human relations problem of how to effectively integrate white and Black students into mixed-race schools:

[T]here has been an elimination of the dual system of education as far as the physical operation goes but that there are additional steps that need to be taken relative to the development of programs and the improvement of relationships of all groups in employment practices and other aspects of integration.

Minutes of the State Board of Education (Feb. 26, 1970) at 333. To that end, Superintendent Sensenbaugh had appointed an Advisory Committee on Ethnic and Cultural Minorities "to work on the problem of how to integrate the cultural heritage of minorities into the educational program." *Id.* The Superintendent's remarks thus suggest that MSDE, at least, believed the process of desegregation had entered a new phase, requiring a new focus on eliminating sources of racial division and misunderstanding.

The Advisory Committee developed a wide-ranging set of recommendations for ways to improve interpersonal and intercultural understanding, including policies to prevent discrimination in hiring, assignment, and promotion of staff. For example, specific recommendations offered by the Advisory Committee included a plan for "broad and intensive inservice training programs in inter-group relations . . . that are directed toward positive attitudinal and behavioral changes of administrators, teachers, and students." Minutes of the State Board of Education (April 29, 1970) at 363 (Advisory Committee Recommendation D.3). Another recommendation proposed that teacher certification programs include courses in human relations "that provide an understanding of cultural and ethnic groups." *Id.* at 365 (Recommendation D.4). While some of the recommendations included proposals regarding desegregation of personnel and nondiscrimination,[10] we found no indication that the Advisory Committee recommended creating minority hiring preferences or establishing numeric targets for minority employment.

The Advisory Committee recommendations were discussed and debated at various times over the first half of 1970, though little of the substance of those discussions was recorded. A "suggested resolution" was presented to the State Board on April

---

[10] Several such proposals were listed for reference to the Attorney General, presumably for advice on whether the State Board could legally adopt them. One such proposal stated, "The Maryland State Department of Education shall require the local school districts to develop and implement plans and procedures for, and submit reports on, desegregation of personnel." Minutes of the State Board of Education (April 29, 1970) at 366. Another stated, "[MSDE] shall require each local school district to prepare policy statements on hiring, placing, and advancing school personnel at all levels, to develop and use plans and procedures for desegregating personnel, and to submit such plans and procedures to [MSDE]." *Id.*

29, 1970, stating a new "Policy on Ethnic and Cultural Minorities." As in the discussion from February of the same year, the suggested policy statement includes an expression of the importance of addressing the less tangible aspects of integration. The suggested resolution states in relevant part:

> It is imperative that local boards of education complete the integration of schools including the assignment of pupils, teaching staff, and other personnel. Further, all steps shall be taken to establish school conditions which will guarantee each pupil's right to learn and to participate in a democratic school climate and to offer the opportunity to develop intercultural understandings and values.

Res. No. 1970-25, attached to Minutes of the State Board of Education (April 29, 1970).

At the same time it was considering the Advisory Committee report and the formulation of a new policy, the State Board was also considering two other matters involving the hiring and assignment of minority faculty and staff. First, MSDE staff and State Board members had voiced concerns about a relative decline in Black employment around this time, particularly among principals, and had raised questions about the fairness and inclusiveness of county boards' employment practices. On September 30, 1969, for example, the Board heard a report of the employment of principals, by race, from 1954 to 1968. Minutes of the State Board of Education (Sept. 30, 1969) at 275. In presenting the report, the Associate State Superintendent indicated that it was "for information only and not for action since the staff will make recommendations which might ameliorate the situation." *Id*.[11]

---

[11] In the interim, the State Board considered a second report on the employment, by race, of principals in the elementary and secondary schools in the State, this one for the school year 1968-69. *See* Minutes of the State Board of Education (June 24, 1970) at 385. This second report suggested that African-Americans were being held to a higher standard than whites in the selection of principals and that "generally black principals have more training in terms of certification requirements than white principals." *Id*.

Although formal Board action on the report would have to wait for those recommendations, one State Board member observed that the data included in the report might be immediately "helpful" in a second matter that had "just been brought to the attention of the Board," this one concerning Charles County.  *Id*.  The case began with a dispute over the selection of majorettes at La Plata High School that subsequently encompassed "a variety of complaints" about the operation of the Charles County school system.  *Morton v. Charles County Bd. of Educ.*, 520 F.2d 871, 875 (4th Cir. 1975).  The State Board appointed a task force to address these complaints and to prepare a report on a number of related issues, including the county board's hiring and assignment practices.  The task force filed its report on April 24, 1970, and the State Board issued its opinion on July 16, 1970.  *See Charles County Branch of NAACP v. Charles County Board of Education*, 1 MSBE Op. 43 (1970).

In its July 1970 *Charles County* opinion, the State Board extensively discussed the task force's recommendations on the recruitment and hiring of Black faculty.  In Recommendation No. 7, the task force had advised that "qualified black personnel be deliberately and extensively recruited," that the number of visits to predominantly black colleges be "significantly increased," and that black staff members should be included on all recruiting teams.  *Id*. at 48.  The State Board first described the issues it was undertaking to address:

> This recommendation of the task force goes to the heart of the present dispute.  The question has been asked by administrators of the Charles County school system whether the school administration is not expected to be totally colorblind in its hiring policy.  The question has also been posed as to whether deviation from present hiring practices would mean that persons would be employed on the basis of race, without regard to qualifications.
>
> To lay down guidelines in this area which are both fair and useful standards when educational administrators are called upon to apply them is not an easy task.  Nevertheless, it is one which this Board must undertake.

*Id.* The State Board then gave the following instruction to the school board about how it should go about the process of hiring faculty:

> We hold that truly colorblind administration of our public schools must remain our ultimate goal. We must recognize, however, that we are now in a period of transition, in which we are trying to move from a historical background of second-class citizenship for one group to a social order which offers first-class citizenship to all. In order to achieve this end we must be aware of the fact that if present administrators fail to take the racial factor into account, they might permit white predominance not because they intentionally discriminate but because they will be drawing on their personal acquaintances and their personal contacts for personnel suggestions and recommendations. So as to provide the kind of balance in the school administration that will permit all groups in the population to feel that they are fairly represented it is necessary for the school systems to make an extra effort in recruitment to look for qualified black applicants. We emphasize, in this context, that the applicants must indeed be qualified. We are not suggesting that standards be lowered in order to employ black teachers and administrators.

*Id.* at 49.

The State Board also responded to the task force's Recommendation No. 9, which advised that Charles County "adopt a policy and practice of employing, assigning, and promoting black staff members at a ratio that will produce greater equity and that will insure black students a greater opportunity for motivation and achievement":

> In our discussion of teacher recruitment . . . we have stated our reasons for giving consideration to racial factors in the application of employment policies. We

> believe that the same considerations should apply in balanced assignments and in promotions. To be sure, we do not construe the task force's recommendation to require a specific numerical ratio for black assignments and promotions. We construe the recommendation simply to require racial balance. As so construed, we approve this recommendation.

*Id.* The State Board also approved and "urge[d the] prompt implementation" of the task force's recommendation that the county board "establish fair and clear procedures for promotion that apply equally to all candidates" and "make these procedures and their implementation visible to all professional staff within the system and to all candidates outside the system, so that all candidates follow the procedure for selection and know the status of their candidacy." *Id.* at 48 (Recommendation No. 5). The Board also approved a recommendation to increase the "representation of black professional administrators and teachers" on the district's Screening Committee. *Id.* (Recommendation No. 6).

On July 29, 1970—just two weeks after it rendered its decision in the Charles County matter—the State Board turned to the new statewide personnel policy that it had been formulating in response to the recommendations of the Advisory Committee on Cultural and Ethnic Minorities and the hearings held that spring. That day, the State Board approved bylaws 660, 661, and 661:1, which established what is now the Integration Rule:

> WHEREAS, The dual system of public education has been eliminated in the public schools of the State; and
>
> WHEREAS, Steps have been taken to proceed with the integration of ethnic and cultural minorities in all aspects of public education; and
>
> WHEREAS, The State Board of Education considers it necessary and appropriate to provide guidelines for such integration in its bylaws; now, therefore, be it
>
> RESOLVED, That Bylaw 761, 761:1, 761:2, and 761:3 are hereby repealed and the following bylaws are hereby enacted:

660   Assignment of Personnel

661   Integration

661:1   Integration of Personnel

Local boards of education shall develop and implement plans and procedures for the attainment of racial balance at the various levels of the public school system, reflective of the composition of the population of their respective jurisdictions.   Such plans and procedures shall apply to the hiring, placing, and promotion of all personnel employed at the various levels of the school system.   The plans and procedures provided herein shall be submitted to the State Department of Education by January 1, 1971.   The Department shall also require and review reports from local boards on the implementation of this Bylaw.

Minutes of the State Board of Education (July 29, 1970) at 398; *see also* Res. No 1970-39, "Policy on Ethnic and Cultural Minorities" (attached to Minutes).  By that same resolution, the State Board adopted two other bylaws, which addressed, respectively, requirements that all schools include courses "for developing understanding and appreciation of ethnic and cultural minorities" and that "organization of school activities shall provide for the involvement of students regardless of sex, race, creed, or national origin."  *Id.* (adopting bylaws 325:1 and 761:1, now codified at COMAR 13A.04.05.03A (requiring schools to provide "appropriate instruction for developing knowledge, understanding, and appreciation of cultural groups in society") and 13A.08.01.16, respectively).

Little of the discussion relating to the formal adoption of the integration bylaws is captured in the minutes of the State Board. However, the statements of the Superintendent, the character of the recommendations, and the form of the adopting resolution leave little doubt that the State Board considered each of the three bylaws to be measures that would aid in the successful integration of schools.  Each is forward-looking and explained by reference to the anticipated needs of schools moving from desegregation to integration.  By contrast, we found no statements of the State Board or MSDE staff purporting to examine or measure the extent

of past employment discrimination in particular jurisdictions, nor did we see attempts to justify the bylaw on such grounds.

This is not to say that the State Board was unaware or unconcerned about past employment discrimination; it was neither. But its overriding purpose in adopting the Integration Rule appears to have been to set the conditions for successful integration, including the establishment of fair and inclusive employment policies to attain "racial balance" at all levels.

The kinds of initiatives that appear to have been envisioned by the State Board are similar to those that had been implemented under the federal Emergency School Assistance Program of 1970 ("ESAP"). President Nixon announced ESAP in a major national address on school desegregation on March 24, 1970. Its purpose was to provide federal funds to meet the special needs of school systems that were in the "terminal phase" of desegregation, including programs to promote understanding among students, staff, and parents; curriculum revision; extra training for teachers to prepare them for working in a desegregated environment; development of new student assessment techniques; and community liaison services. *See*, *e.g*., 45 C.F.R. §§ 181.1–181.3 (first published at 35 Fed. Reg. 13442 (Aug. 22, 1970)). Later remarks by Senator Mondale on the shortcomings in the implementation of ESAP, and on the need for similar legislation, offer some insight into how policymakers at this time tended to view the problem of "integration" in the context of public schools:

> I hope that as we consider the school integration legislation now pending in Congress we can somehow recognize that integration implies more than just the mixing of children behind school doors. It can be successful only if there are programs designed to emphasize those human elements—the warmth, receptivity, sensitivity, and respect which children and adults must have for each other if we are to get along together in our society. I believe that integration, not mere desegregation, is an indispensable element in our education process. But it won't work, indeed it will fail, unless federal aid designed to help integration is directed toward the kind of culturally sensitive programs designed to foster human understanding.

117 Cong. Rec. S6659 (daily ed. March 16, 1971) (statement of Sen. Mondale). From what we have been able to determine from the administrative record, Bylaw 661:1 and the Integration Rule were cut from this same cloth.

We acknowledge that the historical account of the Integration Rule provided here differs somewhat from the explanation provided in the *Vaughns v. Board of Education of Prince George's County* litigation, which generated the only published court decision that mentions the Integration Rule. *Vaughns* involved efforts to desegregate the student body, faculty, and staff of the Prince George's County school system between 1971 and the conclusion of the litigation in 1998. *See Vaughns v. Board of Educ. of Prince George's County*, 355 F. Supp. 1034 (D. Md. 1972); *Vaughns v. Board of Educ. of Prince George's County*, 18 F. Supp. 2d 569 (D. Md. 1998) (approving settlement). The *Vaughns* court touched upon the Integration Rule in a 1990 opinion addressing the system's "assignment of teachers in order to achieve certain degrees of racial integration." *Vaughns v. Board of Educ. of Prince George's County*, 742 F. Supp. 1275, 1277 (D. Md. 1990). In that opinion, the court related that, in a non-evidentiary hearing held in open court, "the parties agreed that the [Integration Rule] was issued, in part, as a response to 'pressure' from HEW to cure past racial segregation in the public schools, including discrimination in faculty hiring and assignment." *Id*. at 1278 n.8.

The description offered by the parties—which did not include the State Board—would have appeared, 20 years after the fact, as a plausible explanation of how the Integration Rule came about, but it cannot be squared with the historical record that the State Board has been able to uncover during the preparation of this opinion. The State Board minutes include no discussion of HEW policy as an influence on the creation of the Rule, and we have found no evidence that it was ever HEW policy to encourage State or county school officials to hire minority job applicants in proportion to their numbers in the population at large, whether as a generalized "cure" for past discrimination or for any other reason. As mentioned above, HEW regulations at that time were concerned with the distribution of white and Black faculty in schools across the district in order to avoid the establishment of "racially identifiable" schools; HEW regulations did not make the overall level of minority employment an element of the desegregation remedy. Instead, the historical record indicates that the State Board promulgated the Integration Rule not as a remedy

for past discriminatory hiring practices, but in an effort to create the conditions that would allow for the complete and successful integration of Maryland schools.  As discussed in Section C.1. below, this distinction is constitutionally significant.

### C.    *Implementation of the Integration Rule from 1971 to the Present*

Although the historical record describes in some detail the origins of the Integration Rule, it is considerably less helpful on the rule's implementation.  The State Board's records appear not to include either the "plans and procedures" that school systems were required to submit by January 1, 1971, or the local board "reports" that the State Board was to "require and review." COMAR 13A.07.05.01.  The same appears to be the case for St. Mary's County; the County Board indicates that it submitted the necessary plan but has not been able to provide a copy of it.

Other sources, however, allow us to sketch the historical narrative of integration in the years after the rule's promulgation. In 1971, HEW revised its guidelines for school systems desegregating under a voluntary plan and expressly adopted the *Singleton* Rule.   In the revised guidelines, HEW tied plan compliance to the achievement of a sufficiently uniform racial distribution of teachers and administrators, such that no school in the system would be racially identifiable as a white or Black school by the composition of its faculty.  *See* 36 Fed. Reg. 11769 (June 18, 1971) ("Nondiscrimination in Elementary and Secondary Schools: School Staffing Practices").   And while school districts had "for the past several years reported to HEW's Office for Civil Rights on the racial and ethnic composition of their staffs," HEW announced that it would take a more active role in monitoring school employment:

> [I]t will now be HEW's policy to make further inquiry into staffing practices whenever it appears from this or other information either that a school district may be making its assignment of teachers or staff to particular schools on a basis that tends to segregate, or that the racial or ethnic composition of its staff throughout the system may be affected by discriminatory hiring, firing, promotion, dismissal, or other employee practices.

*Id.*

Federal oversight of school systems' compliance with Titles VI and VII also increased in 1974, when the Equal Employment Opportunity Commission ("EEOC"), jointly with HEW's Office of Civil Rights, began requiring local school systems to submit two types of race and ethnicity reports ("EEO-5"): one EEO form covered the race and ethnicity of the entire workforce of the public school system, while a second covered the race and ethnicity of the workforce of each individual school within the system. *See* 60 Fed. Reg. 63010 (Dec. 8, 1995) (giving the history of the reports). Sometime thereafter, based on MSDE's review of the available records, it appears that MSDE began monitoring minority employment trends using the EEOC reporting system rather than implementation reports under the Integration Rule.

In 1996, however, the EEOC discontinued the requirement that each individual school file an EEO-5 form. 61 Fed. Reg. 33659 (June 28, 1996) (amending 29 C.F.R. § 1602.41). According to current MSDE staff, MSDE continued to review the school-system-wide EEO-5 forms which were submitted biennially. Also according to MSDE staff, if the review indicated that there might be an issue concerning racial balance in a particular school system, the Director of the Office of Equal Opportunity would contact the superintendent of the school system and discuss the issue informally. It is our understanding that MSDE's review of EEO-5 forms ceased altogether in 2002 when the EEOC encouraged school systems to file them by diskette, magnetic tape, or other electronic format. *See* 67 Fed. Reg. 45113 (July 8, 2002). Thereafter, MSDE did not receive a copy automatically.

Since 2002, MSDE has not received any written reviews or formal reports on the further implementation of the Integration Rule. In fact, MSDE staff were unable to locate any implementation reports among the files remaining from this period. And while the State Board's minutes from this period reflect staff briefings to the State Board on equity in employment, the minutes do not refer to any actions—taken under the Integration Rule or otherwise—to compel local boards to increase their percentage of minority employees through hiring preferences, set-asides, or quotas. The minutes also contain no evidence that the Integration Rule was relied upon to decide or justify any particular employment decision. MSDE does, however, continue to gather and compile information on the racial

make-up of the school systems' employees.  *See*, *e.g*., Maryland Teacher Staffing Report (2012-2014).

## II

## Analysis

You have asked whether the Integration Rule imposes any current obligations on local boards of education and, if so, whether those obligations are valid and enforceable.  In particular, you wish to know whether the regulation currently requires local boards of education to achieve a "racial balance" in employment that reflects the racial composition of the local population.  Our answer addresses, first, whether the State Board intended to impose such a requirement when it adopted the Integration Rule, and, second, whether the rule is still valid.

### A.  *The Integration Rule Does Not Set a Hiring Quota or Preference Linked to the Racial Make-Up of a County's General Population; Rather, it Sets Racial Balance as an Aspirational Goal that May be Met Through Efforts Such As Recruitment.*

Agency rules or regulations are interpreted in the same manner that statutes are interpreted.  *See*, *e.g.*, *Crofton Convalescent Ctr.*, *Inc. v. Dep't of Health & Mental Hygiene*, 413 Md. 201, 216 (2010) ("rely[ing] on principles of statutory interpretation to determine the meaning [of a regulation]"); *Maryland Port Admin. v. Brawner Contracting Co*., 303 Md. 44, 60 (1985) ("[O]ur holdings relative to the interpretation of statutes are equally applicable to the interpretation of rules.").  Like statutes, "rules have 'some object, goal, or purpose'; the task of construction is to discern that purpose and carry it out sensibly." 73 *Opinions of the Attorney General* 57, 62 (1988) (citing *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513 (1987)).  We, like a court, must "direct our analysis, at the outset, to the plain language of the statute in question."  *La Valle v. La Valle*, 432 Md. 343, 355 (2013).  Thus, where the plain language of the rule, in context, is unambiguous, the task of construction ends. *Crofton Convalescent*, 413 Md. at  216.  But where the plain language is susceptible to more than one reasonable interpretation, we must "resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Lockshin v. Semsker*, 412 Md. 257, 276 (2010).  Here, in addition to the text of the rule, we are guided by the statement of purpose that the State Board included in the resolution adopting the rule,

the State Board's meeting minutes reflecting the development of the rule, and the State Board's contemporaneous explanation of how it understood the term "racial balance."

Two additional canons of interpretation are relevant here. First, an agency's interpretation of its own regulation should be accorded "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Ideal Fed. Sav. Bank v. Murphy*, 339 Md. 446, 461 (1995) (quoting *Bowles v. Seminole Rock & Sand Co*., 325 U.S. 410, 414 (1945)); *see also Adventist Health Care*, *Inc. v. Md. Health Care Comm'n*, 392 Md. 103, 120 (2006). We thus look to the available information on how the State Board applied the rule after its adoption. And, we must be mindful of the doctrine of "constitutional avoidance," which cautions against interpreting a statute or regulation in a way that would render it unconstitutional when another interpretation is "reasonably possible." *See*, *e.g.*, *Koshko v. Haining*, 398 Md. 404, 425 (2007); *Weaver v. United States Info. Agency*, 87 F.3d 1429, 1436 (D.C. Cir. 1996) (applying canon of constitutional avoidance to regulation). Thus, if it is reasonably possible to construe the Integration Rule in a way that makes it constitutional, we must prefer that construction.

The plain language of the Integration Rule mandates the development of "plans and procedures." The regulation is not itself an employment plan, but a guideline for the plans and procedures that each local board of education must create and implement. The first sentence of the regulation requires that those plans and procedures shall have a certain aim: "Local boards of education shall develop and implement plans and procedures for the attainment of racial balance at the various levels of the public school system, reflective of the population of their respective jurisdictions." COMAR 13A.07.05.01. The second sentence describes the scope of the plans: "These plans and procedures shall apply to the hiring, placing, and promotion of all personnel employed at the various levels of the school system." *Id.* The third sentence sets January 1, 1971, as the deadline for submission of the plan, but the regulation does not otherwise include any timetable for achieving the goal of "racial balance . . . reflective of the composition of the population . . . ." *Id.* The final sentence provides for reports: "The Department shall also require and review reports from local boards on the implementation of this regulation." *Id.*

The Integration Rule is unambiguous in some respects; the county boards clearly had to submit plans by January 1, 1971, and then submit whatever reports MSDE required. It is not clear from the text of the regulation, however, what the term "racial balance" means. Does it require school systems to hire (or not hire) minority candidates until the percentage of minority faculty and staff matches that of the surrounding community? Or was "racial balance" intended more generally as an aspirational goal that would not determine specific hiring decisions? In either case, the constitutional validity of setting "racial balance" as a system-wide goal must be assessed. Before reaching that question, however, we must try to determine what the State Board intended its regulation to do.

### B. *The Integration Rule Does Not Require Policies that Establish a Racial Preference or Quota*

We begin by recognizing that the State Board, when it used the term "racial balance," was not writing on a blank slate; by 1970, the term appears to have developed a generally accepted meaning. During the 1960s, "racial balancing" had come to describe measures designed to promote actual integration of educational institutions, as opposed to freedom of choice plans and other measures designed simply to discontinue *de jure* discrimination. "Racial balancing" included measures employed as a race-conscious means to undo student attendance or teacher assignment patterns that had been required by law under segregation and that persisted despite the elimination of such laws. *See, e.g.*, Owen M. Fiss, *Racial Imbalance in the Public Schools: The Constitutional Concepts*, 78 Harv. L. Rev. 564 (1965) (arguing that race-conscious policies to address *de facto* segregation in public schools are necessary and constitutional). They also included measures employed as a matter of education policy, to better prepare students for life in a multicultural society. *See Anderson v. San Francisco Unified School District*, 357 F. Supp. 248, 251 n.7 (N.D. Cal. 1972) (noting district's voluntary 1968 education policy to achieve "faculty racial and ethnic balance").[12] "Racial balance," it seems, was understood to mean

---

[12] In March 1968, the Board of Education of the San Francisco Unified School District adopted an Affirmative Action Policy, which provided in part:

> It is the policy of the Board of Education to implement a program of faculty racial and ethnic balance which more closely approximates the

a policy that looked beyond the elimination of *de jure* segregation toward the goal of affirmative integration—the creation of a more racially balanced student body and faculty.[13] The term was thus used in contradistinction to policies, like "freedom of choice" plans, that were indifferent to the ultimate outcome, where nondiscrimination alone is the goal, regardless of whether it perpetuates imbalances created by past discrimination or results in schools that are only nominally desegregated. *See*, *e.g*., *McDaniel v. Barresi*, 402 U.S. 39, 41 (1971) (reversing Supreme Court of Georgia's holding that Fourteenth Amendment prohibits assignment of students based on race in order to achieve racial balance in formerly segregated school system).

Congress, in the Civil Rights Act of 1964, used the term "racial balance" in this sense to distinguish between measures necessary to end *de jure* discrimination and those undertaken to correct for *de facto* segregation of school populations. The Act defined "desegregation" to mean "the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin." 42 U.S.C. §§ 2000c(b).

---

> racial and ethnic distribution of the total school population so long as such efforts maintain or improve quality of education.

*Anderson*, 357 F. Supp. at 251 n.7. Administrative regulations to implement the policy explained that it was intended, in part, to improve the aspirations of minority students in schools with large minority populations and, in schools with large numbers of white children and teachers, to offer "integrated experiences." *Id*. at 251.

[13] Notably, the Civil Rights Act of 1964 contained provisions distinguishing the concept of "racial balance" from "desegregation," and limiting federal officials' authority to pursue the former as opposed to the latter. *See* 42 U.S.C. §§ 2000c(b) (defining "desegregation" to mean "the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance"); 2000c-6 (stating that the powers granted to the Attorney General to institute federal lawsuits does not "empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another"); *see also Swann*, 402 U.S. at 16-17 (construing these provisions as limiting federal executive powers under the Act, but not as limiting courts' remedial powers to eliminate dual systems of education).

It specifically provided, however, that "'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance." *Id.* Congress also made clear that the remedial provisions of the Act did not "empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another . . . ." 42 U.S.C. § 2000c-6. Justice Powell, writing as Circuit Justice, observed that Congress, in the Act, had used the phrase "achieve a racial balance" in the sense of "eliminating 'de facto segregation'"— which the Act did not permit—as opposed to remedial measures necessary to end *de jure* segregation. *Drummond v. Acree*, 409 U.S. 1228, 1230 (1972). Although the Supreme Court ultimately concluded that the limitations within these provisions of the Civil Rights Act did not "restrict" the Court's existing remedial powers, *see Swann*, 402 U.S. at 16-17, it directed that the focus of those powers "must be on dismantling dual school systems rather than on achieving perfect racial balance." *Drummond*, 409 U.S. at 1230.

When used in the context of desegregation cases, then, "racial balancing" denoted an accepted constitutional practice when necessary to eliminate the effects of *de jure* segregation. In that setting, achieving "racial balance" could entail the assignment of students or faculty to particular schools expressly based on race. *See*, *e.g.*, *Swann*, 402 U.S. at 25 (approving use of prescribed mathematical ratios of white and Black students in each school as "a starting point in shaping a [desegregation] remedy."). But where race has been used as an assignment criterion to advance goals beyond the dismantling of dual school systems, courts have frequently disapproved of the practice, often under the rubric of "racial balancing." *See id*. at 24 (disapproving notion that there is a "substantive constitutional right [to] any particular degree of racial balance or mixing").

In *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424 (1976), for example, a 1970 decree to desegregate the city's school system included a "no majority of any minority" provision, which the district court interpreted to require periodic adjustment of attendance zones to prevent that from occurring. *Id*. at 431-33. The Supreme Court rejected that feature of the decree, holding that, once "a racially neutral system of student assignment" had been established, the district court exceeded its authority by requiring annual readjustment of attendance zones to redress disparities not caused by the school system. *Id*. at 434-35. The district court had erred, the Court held, because it had ordered

racial balance not as "a 'starting point in the process of shaping a remedy,' which *Swann* indicated would be appropriate, but instead as an 'inflexible requirement' . . . ." *Id*. at 434 (quoting *Swann*, citations omitted).

Thus, in many later cases, "racial balancing" is used by courts to describe, and disapprove, policies designed to achieve a particular distribution of benefits according to race through the use of quotas, set-asides, or other forms of racial preference. *See*, *e.g.*, *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013) (citing disapproval of "racial balancing"); *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 732 (2007); *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003); *Eisenberg v. Montgomery County Bd. of Educ.*, 197 F.3d 123, 130-31 (4th Cir. 1999), *cert. denied*, 529 U.S. 1019 (2000); *Tuttle v. Arlington County School Board*, 195 F.3d 698, 707 (4th Cir. 1999). None of these cases held, however, that the aspiration for a more "balanced" or representative outcome is illegitimate in itself, only that the means to promote such goals are subject to constitutional limits on the use of race as a criterion for assigning students or faculty.

Turning now to the Integration Rule, the historical context and plain language of the rule show that the State Board was not indifferent to the racial composition of the faculty and staff of public schools. In prescribing plans and procedures for the attainment of "racial balance . . . reflective of the composition of the population," the State Board set a goal that it believed would promote successful integration. The regulation does not, however, explicitly state what sorts of plans and procedures are appropriate to achieve that goal. Our interpretive task, therefore, is to determine whether the State Board's regulation *requires* a certain racial balance among school staff, which might suggest a quota or other form of preference, or whether the goal was to be pursued in other ways. As we explain below, we are persuaded that the State Board did not intend the Integration Rule to establish a system of racial preferences.

First of all, the rule states its employment goals in general terms, using language that does not lend itself to precise definition or a rigid numerical standard. For example, the rule calls for "racial balance" rather than a specific percentage target or range, and calls for such balance to be "reflective of . . . the composition

of the local population" rather than *equal* or *proportional* to it.[14] Indeed, the State Board explicitly adopted the Integration Rule as "guidelines" for the "integration of cultural minorities in all aspects of public education," Resolution No. 1970-39, and not as a hiring quota. These textual clues suggest that the State Board did not intend "racial balance" to constitute a binding norm.

Contemporaneous agency materials confirm that suggestion. The Board's own use and discussion of the term in the *Charles County* opinion, issued less than two weeks before the Board adopted the Integration Rule, provide no indication that the State Board viewed the goal of "racial balance" to signify more than inclusiveness. *See Charles County Branch of NAACP*, 1 MSBE Op. 43. That opinion, in which the State Board repeatedly referred to "balance," offers important insight into what the State Board meant by the term and why implementation of inclusive employment practices, such as minority recruitment efforts, was needed.

The State Board used the term "balance" in its discussion and approval of the recommendations made by the task force it had appointed to study the operations of the Charles County school system. Addressing the task force's recommendation that "qualified black personnel be deliberately and extensively recruited," the Board explained that "we are trying to move from a historical background of second-class citizenship for one group to a social order which offers first-class citizenship to all." *Id.* at 49. The Board noted the risk that "white predominance" in staffing might occur if "present administrators" were to draw alone on "their personal acquaintances and their personal contacts for personnel suggestions." *Id.* The Board's objective in acting on the recommendation, then, was "to provide the kind of balance in the school administration that will permit all groups in the population to feel that they are fairly represented . . . ." *Id.* Achieving that balance necessitated "an extra effort in recruitment to look for qualified black applicants," *id.*, but not a hiring quota.

---

[14] Public comments on the rule appear to have used similarly imprecise terminology. For example, the minutes for the State Board's July 16, 1970 meeting report a proposal from George Foster, President of the Charles County Branch of the NAACP, urging "the Board to consider very strongly a program that will force the superintendent to have a balance of teachers to be representative of the black community." Minutes of the State Board of Education (July 16, 1970) at 388B.

The State Board used the term "balance" again when it addressed the recommendation that Charles County "adopt a policy and practice of employing, assigning, and promoting black staff members at a ratio that will produce greater equity and that will insure black students a greater opportunity for motivation and achievement." *Id.* The Board's explanation of its qualified approval of that recommendation is particularly instructive on the Board's use of the term "balance":

> In our discussion of teacher recruitment . . . we have stated our reasons for giving consideration to racial factors in the application of employment policies. We believe that the same considerations should apply in balanced assignments and in promotions. To be sure, *we do not construe the task force's recommendation to require a specific numerical ratio for black assign-ments and promotions. We construe the recommendation simply to require racial balance.* As so construed, we approve this recommendation.

*Id.* at 50 (emphasis added). And, as to promotion, the State Board approved, and "urge[d] . . . prompt implementation" of, the recommendation that the county board "establish fair and clear procedures for promotion that apply equally to all candidates . . . ." *Id.* at 48.

Thus, two weeks before it adopted the Integration Rule, the State Board viewed "balance" in employment as measurable by whether "all groups in the population feel that they are fairly represented." *Id.* at 49. According to the State Board, "racial balance" did not require a quota and did not imply that counties were required to grant preferences to minority candidates in individual hiring and promotion decisions. Further, the State Board indicated that "racial balance" was to be achieved by "fair and clear procedures for promotion that apply equally to all candidates." *Id.* at 48. In effect, striving for "balance" was regarded as a means to prevent discrimination—conscious or not—and to ensure that the local board's hiring, recruitment, and promotion efforts were both fair and inclusive.

The need for proactive measures of this kind may be readily inferred from the counter-example of a segregated school system

in Texas that desegregated its faculty without adhering to formal policies. *See Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133 (5th Cir. 1981). There, prior to desegregation, minority teachers made up approximately 18% of the Fort Bend school system's faculty. *Id.* at 1135. By the 1968-69 academic year, the district's first year operating without any one-race schools, only 9.8% of its faculty was African-American, and that percentage continued to decline through 1974-75. *Id.* According to the school superintendent, "district officials generally perceived black teachers formerly assigned to the black schools to be unqualified to assume equivalent positions in desegregated schools." *Id*. at 1136. A number of African-American teachers were indirectly pressured to resign or retire, knowing that they likely faced demotion. *Id.* The school district also lacked a formal recruitment program. Instead, the superintendent "would seek applicants primarily by requesting referrals from his friends and colleagues in education," and "since most of his professional acquaintances were white, this process produced few minority applications for teaching positions" in the district. *Id*.; *see also Rock v. Norfolk & Western Ry. Co*., 473 F.2d 1344, 1347 (4th Cir. 1973) (word-of-mouth hiring and job assignment system tended to perpetuate discrimination against African-Americans).

The Integration Rule's emphasis on achieving "racial balance" in school staffing decisions can therefore be seen as an effort to guard against the type of exclusionary policies that the Texas case exemplified and that the Board had cautioned against in its Charles County opinion. Given the State Board's disavowal of any purpose to approve a "specific numerical ratio for black assignments and promotions" in that opinion, we should be cautious about attributing such intent to the Board under its Integration Rule.

Our interpretation of the regulation is also consistent with the State Board's and MSDE's application of the Rule. We describe in Part I of this opinion how, before and after adoption of the Integration Rule, the State Board and MSDE tracked minority employment trends and hoped to improve them. As the following passage from the State Board's 1971 minutes suggests, however, the Board used employment statistics as "diagnostic tools" rather than bases for selection of individual employees for hiring or promotion:

> Mr. Schifter [a member of the State Board] said he believed we should address ourselves to work on actual adherence by the county systems to a program of giving all people,

including black people, full opportunity of teaching and engaging in supervision. Numbers in themselves will be self defeating. He said major problem areas should be identified in order to distinguish them from those problems of less significance or no problem at all. Mr. Schifter stated that recruitment policies should be examined because little progress has been made in the sense of more equitable distribution of the staff. Mr. Schifter felt that it was important that the department take a look at every subdivision to make certain no discrimination is taking place. He recommended that a citizens' committee working with staff be appointed for the specific task of drawing up a roster that would be available State-wide for recruitment purposes. Mr. Schifter said such an arrangement would be an incentive for people to get on the list. Using the list for employment purposes would be voluntary.

Minutes of the State Board of Education (Oct. 27, 1971) at 590. Such remarks are consistent with a State policy to root out discrimination and encourage more inclusive employment practices, and they suggest that underrepresentation of minority teachers is better addressed through targeted recruitment efforts than through hiring quotas. In other words, the Board's concern was to ensure equal treatment for minority candidates, not simply to achieve a numerical hiring goal. *See id.*

Indeed, we found no instance where the Integration Rule was relied upon to make or explain an individual hiring decision. For example, in *Nutter v. Cecil County Board of Education*, 1 MSBE Op. 60 (July 28, 1971), an administrative appeal of a county employment decision, the Board's only allusion made to "State policy" concerned the county board's duty to recruit and consider minority job candidates. The petitioner in *Nutter* was a former principal of a formerly all-Black school who had lost her principal's job when the school was closed as part of the local desegregation plan. When a later principal vacancy arose, she applied for the position, but the county board hired a white candidate. The State Board upheld that decision, observing that

the County had "made an affirmative effort to recruit Negro administrators . . . as required by State policy." *Id*. at 61.

Moreover, we found no evidence that MSDE took formal action to enforce the regulation by requiring the attainment of particular employment levels. In short, MSDE's application of the Integration Rule, during that period when MSDE relied upon it, does not indicate that MSDE or the State Board understood the regulation to create a quantifiable employment standard or require the counties to make race-based hiring decisions in order to meet an employment goal.

We therefore conclude that the State Board used the term "racial balance" as an aspirational goal and used minority employment numbers not as an enforceable requirement, but as a diagnostic tool for the county boards to gauge their progress toward attaining that goal. The Rule thus functioned as an assessment mechanism for the State Board and a guideline for county boards on the requirements for successful integration of public schools. We next consider whether the Integration Rule, given the meaning we ascribe to it, is valid under current law governing nondiscrimination in public employment.

### C.   *Validity of the Integration Rule, as Construed as a Measure to Identify Discriminatory Practices, Encourage Recruitment Efforts, and Evaluate the Attainment of "Racial Balance"*

As we have construed the Integration Rule, it required local boards to formulate employment policies that would further the true integration of their schools, required them to implement those policies, and provided the State Board with a mechanism for assessing the various systems' progress towards integration. We have little concern with the proposition that the State Board may require reports that would enable it to identify discriminatory practices. Certainly, then, the Integration Rule remains viable for these purposes. That leaves the question of whether an aspirational goal that school personnel reflect the composition of a jurisdiction's population is permissible under current law, and, if so, what measures may be taken to attain it.

#### 1.   **The Law Prohibits Race-Based Discrimination in Employment Through Quotas or Hiring Preferences**

Both Title VII of the Civil Rights Act and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibit discrimination in employment on the

basis of race. As relevant here, Title VII makes it unlawful for an employer (1) "to fail or refuse to hire or to discharge" any individual, or otherwise to racially discriminate against any individual "with respect to his compensation, terms, conditions, or privileges of employment," or (2) "to limit, segregate, or classify," on grounds of race, "any employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee . . . ." 42 U.S.C. § 2000e-2(a).

The Fourteenth Amendment's Equal Protection Clause presents a more stringent standard for using race in employment decisions than does Title VII. *See*, *e.g*., *Johnson v. Transp. Agency*, 480 U.S. 616, 628 n.6 (1987) (Title VII's statutory prohibition "was not intended to extend as far as that of the Constitution"). The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend XIV, § 1. Accordingly, the Supreme Court has held that, "when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 720 (2007). Strict scrutiny requires the government to prove that its actions advance a "compelling interest" and that its use of the racial classification is "narrowly tailored" to promote that interest. *Id.*

In the employment context, the courts have applied the strict scrutiny standard to invalidate non-remedial quotas, employment preferences, and other policies that require employers to take race into account in individualized employment actions. In *Wygant v. Jackson Bd. of Ed.*, for example, the Court applied strict scrutiny to invalidate a school district's race-based layoff policy that insulated certain minority teachers from system-wide cutbacks to which all other teachers were exposed. 476 U.S. 267 (1986). The school district had relied largely on the argument that its layoff policy was necessary to remedy societal discrimination against minorities, rather than to remedy discrimination caused by the state. The Court applied strict scrutiny and held that remedying general, societal discrimination could not justify allocating individual benefits and burdens based on race. *See id*. at 274-75.

The strict scrutiny standard, while difficult to meet, is not "fatal in fact." *Grutter*, 539 U.S. at 326. The Supreme Court has

recognized at least two "compelling interests" that can support the use of racial classifications in the school context: (1) remedying the effects of past intentional discrimination; and (2) achieving student body diversity in a higher educational setting. *Parents Involved*, 551 U.S. at 720-22; *see also Schuette v. Coalition to Defend Affirmative Action*, ___ U.S. ___, 134 S. Ct. 1623, 188 L. Ed. 2d 613, 621 (2014) (plurality opinion) (observing that "the consideration of race in admissions is permissible, provided that certain conditions are met"). A majority of the Court has also indicated that governments have a compelling interest in achieving a diverse student body and preventing racial isolation in primary and secondary schools. *See id.* at 783, 797-98 (Kennedy, J., concurring in part and concurring in the judgment);[15] *id.* at 838-43 (Breyer, J., dissenting); *see also* Department of Justice, "Guidance on the Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Primary and Secondary Schools," available at http://www.justice.gov/crt/about/edu/documents/guidanceelem.pdf (last visited July 23, 2014) (providing guidance on the application of *Parents Involved*).

Moreover, the Court has not foreclosed the possibility that other compelling interests may exist. For example, some courts have held that a state has a compelling interest in achieving diversity in law enforcement. *See*, *e.g.*, *Alexander v. Milwaukee*, 474 F.3d 437, 445 (7th Cir. 2007); *Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2003); *Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 52 (2d Cir. 2002). In the educational setting, one state court and numerous commentators have suggested that governments may also have a compelling interest in ensuring faculty diversity, at least in colleges and universities. *See*, *e.g.*, *University and Community College System of Nevada v. Farmer*, 930 P.2d 730, 735 (Nev. 1997); Patrick M.

---

[15] Because no single opinion in *Parents Involved* garnered a majority of the Court, Justice Kennedy's opinion is considered controlling, as it represents "the narrowest grounds" for invalidating the two plans. *Marks v. United States*, 430 U.S. 188, 193 (1977) (describing rule applicable to interpretation of fractured decisions of the Court); *see Hart v. Community School Bd. of Brooklyn, New York School Dist. # 21*, 536 F. Supp. 2d 274, 283 (E.D.N.Y. 2008) (applying *Marks* to *Parents Involved*); *N.N. v. Madison Metro. Sch. Dist.*, 670 F. Supp. 2d 927 (W.D. Wisc. 2009) (same). And because the four dissenting justices agreed with Justice Kennedy's conclusion that school systems may consider race as one part of a broader pursuit of diversity, his views on the issue represent those of a majority of the Court.

Garry, The Next Step in Diversity: Extending the Logic of *Grutter v. Bollinger* to Faculty Tenure, 82 Denv. U.L. Rev. 1 (2004); *but see Taxman v. Board of Educ. of Piscataway T'ship*, 91 F.3d 1547, 1563-65 (3d Cir. 1996) (absent a remedial purpose, educational goal of faculty diversity did not justify a school district's discrimination against the majority).

Even if a statute or policy serves a compelling interest, however, it must be narrowly tailored to that interest to survive strict scrutiny. To support a law intended to remedy state discrimination, for example, a government must have a "strong basis in evidence" of the discrimination, and any remedy must target only "the effects of identified discrimination" within the relevant governmental unit. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989). And race-based policies designed to achieve diversity in education likely must advance a broad concept of diversity of which racial diversity is only one factor. *See Grutter*, 539 U.S. at 324-25; *Parents Involved*, 551 U.S. at 788-89 (Kennedy, J., concurring).

Thus, if the Integration Rule were construed to require individualized race-based hiring preferences, we have doubts that it would survive strict scrutiny. We found no evidence in the historical record that the State Board understood the rule as a remedy for discriminatory hiring practices as much as a means to foster a more diverse and culturally enriched educational setting. Moreover, the "remedy" the rule might be read to require—hiring minority candidates to attain racial balance "reflective of the population of their respective jurisdictions"—would almost certainly run afoul of Supreme Court precedent, which requires that any remedial teacher-hiring measure be tied to the "qualified public school teacher population in the relevant labor market." *Hazelwood School District v. United States*, 433 U.S. 299, 308 (1977).

By contrast, and as discussed in the following sections of this opinion, recruitment policies that might help to increase the number of qualified Black teachers from which schools could recruit do not raise the same constitutional concerns.[16] Under the

---

[16] And if teaching could be made equally attractive and open to all parts of the community, it would not be unrealistic for the Board to strive for a representative workforce. *See*, *id*. at 307 (quoting *Teamsters v. U.S*., 431 U.S. 324, 336 (1977), that nondiscriminatory hiring practices may ordinarily be expected "in time" to result in a

canon of "constitutional avoidance," we are to interpret the rule to avoid an unconstitutional construction if "reasonably possible." *See Koshko*, 398 Md. at 425. We need not resort to such interpretive conventions here, however, because, as explained above, we do not believe that the Integration Rule was intended to require quotas or individualized hiring preferences.

> **2. The Courts Have Viewed Recruitment and Outreach Efforts that are Directed to a Racial Group and Intended to Promote Diversity as "Race-Neutral" Measures and Thus Not as Discrimination Subject to Strict Scrutiny.**

The Constitution does not require an "unyielding insistence that race cannot be a factor" in government decision-making. *Parents Involved*, 551 U.S. at 787 (Kennedy, J., concurring). Although "[t]he enduring hope is that race should not matter[,] the reality is that too often it does." *Id*. In part due to this reality, not all race-conscious employment policies have triggered strict scrutiny. *Sussman v. Tanoue*, 39 F. Supp. 2d 13, 25 (D.D.C. 1999) (outreach effort unaccompanied by "actual preferences" did not trigger strict scrutiny), *affirmed sub nom. Sussman v. Powell*, 64 F. App'x 248 (D.C. Cir. 2003). Where the government does not allocate benefits or burdens based on race and does not create a system that imposes "different treatment based on a [racial] classification," it is "unlikely" that strict scrutiny will apply. *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring) (emphasis added).

A government can therefore "be racially 'aware' or 'conscious' by, for instance, amassing statistics on the racial and ethnic makeup of its faculty and encouraging broader recruiting of racial and ethnic minorities, without triggering the equal protection clause's strict scrutiny review." *Honadle v. Univ. of Vermont*, 56 F. Supp. 2d 419, 428 (D. Vt. 1999); *see*, *e.g.*, *Parents Involved*, 551 U.S. 701, 789 (Kennedy, J., concurring) (listing among "race-conscious" mechanisms unlikely to demand strict scrutiny "recruiting students *and faculty* in a targeted fashion; and tracking enrollments, performance, and other statistics by race") (emphasis added); *Duffy v. Wolle*, 123 F.3d 1026, 1038-39 (8th Cir. 1997), *cert. denied* 523 U.S. 1137 (1998) ("An employer's

---

workforce "more or less representative of the racial balance and ethnic composition of the population in the community from which employees are hired.").

affirmative efforts to recruit minority, female applicants does not constitute discrimination."), abrogated on other grounds by *Torgerson v. City of Rochester*, 643 F. 3d 1031 (8th Cir. 2011)); *Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 15557-58 (11th Cir. 1994) (describing fire department's outreach and solicitation of minority applications as "race-neutral" measures that fire department tried before resorting to preferences); *Shuford v. Alabama State Bd. of Educ.*, 897 F. Supp. 1535, 1552 (M.D. Ala. 1995) (finding that efforts to enlarge candidate pool by targeted recruitment did not trigger equal protection analysis); *but cf. MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 20-24 (D.C. Cir. 2001) (invalidating under strict scrutiny FCC rule requiring licensees to conduct "targeted outreach" to minorities and women); *Safeco Ins. Co. v. City of White House*, 191 F.3d 675, 692 (6th Cir. 1999) ("Outreach efforts may or may not require strict scrutiny.").

It also appears that targeted outreach and recruitment measures are permissible even if they include an aspirational hiring goal for minority employees, so long as the aspirational goal does not pressure employers to make individual hiring decisions based on race. *See Sussman*, 39 F. Supp. 2d at 25-28 (upholding FDIC's non-preferential affirmative action plan despite "action items" or goals to increase representation of specific groups in specific jobs). The crux of the matter is thus whether the aspirational goal has, in Justice O'Connor's words, "operational significance," or is instead a broad aspirational statement of policy about the kind of workforce the agency would like to have. *See Johnson*, 480 U.S. at 654 (O'Connor J., concurring).

In this context, courts have examined whether the mere existence of recruitment or hiring goals, by themselves, affected individual employment decisions. Without evidence that they have, such goals have generally been regarded as lawful. *See, e.g., Caulfield v. Board of Educ. of the City of New York*, 632 F.2d 999, 1007 (2d Cir. 1980) (agreement for efforts to achieve levels of minority participation "within a range representative of the racial and ethnic composition of the relevant qualified labor pool" presented no "case or controversy" without demonstration that goal had affected consideration of any individual's job application); *McHenry v. Commonwealth of Pa. State Sys. of Higher Educ.*, 50 F. Supp. 2d 401, 411-12 (E.D. Pa. 1999) ("'aspirational' policies" did not establish a racial preference); *see also Hall v. Kutztown Univ.*, 1998 U.S. Dist. LEXIS 138, *104

(E.D. Pa. Jan. 12, 1998) (aspirational documents and policy to recruit broadest possible applicant pool and hire the most qualified did not establish a "tendency to discriminate").

To be sure, some courts have applied strict scrutiny to purportedly aspirational goals that were not mandatory but inevitably pressured employers to make individualized hiring decisions based on race. *See*, *e.g.*, *Safeco Ins. Co.*, 191 F.3d at 689-92; *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486 (3d Cir. 1999); *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998). But the policies at issue in these cases included explicit penalties for employers that failed to reach the hiring goals. *See*, *e.g.*, *Schurr*, 196 F.3d at 493 (explaining that "in providing for sanctions if [employers] cannot demonstrate good faith efforts to comply with those goals, the regulations were intended to influence employment decisions generally and may, as here, affect concrete decisions"); *Lutheran Church*, 141 F.3d at 353 (noting that failure to meet hiring goals could trigger "intense review" or increased penalties for equal employment opportunity violations). Under those circumstances, the employers may well have felt pressure to take race into account in individual hiring decisions. Where there is no enforcement mechanism for failure to meet such hiring goals, however, there is no similar pressure. *See Sussman*, 39 F. Supp. 2d at 25-28.

Just as the absence of an enforcement mechanism tends to make a hiring goal aspirational, the lack of a timetable for achieving that goal tends to indicate that efforts to increase workforce diversity do not constitute a hiring preference. As the Court observed in *Johnson*, the fact that a hiring plan "contains no explicit end date" suggests that the agency "anticipated only gradual increases in the representation of minorities and women" and not a short-term hiring preference. 480 U.S. at 639. Such aspirational hiring goals in and of themselves are probably not subject to strict scrutiny. With these principles in mind, we next evaluate the Integration Rule's constitutionality.

> **3.    As a General Proposition, the Integration Rule—as Construed to Set Goals and Not to Require the Use of Race in Individual Hiring, Placement, and Promotion Decisions—is Likely Constitutional**

As noted in our introduction, you have not asked us to address any particular provision in the 1971 plan that the County Board adopted under the Integration Rule. As a general proposition, therefore, we conclude that plans that comport with the Integration Rule, which we have interpreted *not* to require

race-based quotas and individualized hiring preferences, would pass constitutional muster.  Given the Rule's absence of precise hiring and promotion quotas, or any timetable for attaining specific employment levels, we think its core function of promoting diversity by preserving opportunities for minority candidates makes the Integration Rule the type of measure that a majority of justices in *Parents Involved* would have upheld as reasonable.  We conclude, then, that the Integration Rule, as we construe it, is facially valid.[17]

The Integration Rule was originally conceived as a means to encourage the racial diversity of administrators, teachers, and other staff in the public schools by preventing discrimination and requiring outreach to the African-American community.  Such diversity or "racial balance" was regarded by the State Board as critical to the successful integration of the public schools where all students would be equally encouraged and motivated to learn, regardless of race.  Most likely, the Board viewed the Integration Rule as a transitional measure, a necessary bridge between the segregationist past and a more inclusive future.

In the more than forty years since the rule's adoption, the need for policies to promote fairness and inclusion for all remains.  What has changed, however, are the specific policies that the State Board has employed to accomplish the task.  In Part I, we noted that, probably due to an increased federal role in monitoring minority employment trends, the plans required by the Integration

---

[17] Without the St. Mary's County plan itself or a historical narrative as to its application, we express no view as to how an as-applied challenge to the Integration Rule might fare.  In deciding whether to apply strict scrutiny in such a challenge, a court would have to conduct a fact-based inquiry to determine whether, in practice, the rule forced counties to make individual hiring decisions based on race.  The process of preparing an Opinion of the Attorney General is not suited to such factual determinations.  We therefore have not assessed whether a plan, if it contains provisions that have not expressly expired, required the County schools to implement any individualized hiring preferences or quotas that would have "operational significance" in individual employment decisions and thus be subject to strict scrutiny.  Nor do we wish to foreclose local school boards from devising hiring, assignment, or promotion policies that take race into account if they believe that those policies would survive strict scrutiny.  The conclusions we reach here are limited to the constitutionality of the Integration Rule, not race-based policies more generally.

Rule appear to have been rather quickly supplanted by EEO reports as the State Board's primary tool for identifying local problems in minority employment. Unsurprisingly, in subsequent years, the State Board developed newer approaches to address the evolving challenges of maintaining a diverse workforce.

An important shift seems to have occurred in 1988, with the State Board's adoption of its "Action Plan for Minority Recruitment." The Action Plan was developed in response to an MSDE report on minority recruitment, which concluded that, due in part to the national scale of the problem, a systemic statewide plan of action was necessary. *See* MSDE, "Task Force on Recruiting Minorities for Professional Staff Positions: Report to the State Superintendent" (March 1, 1988). The Task Force offered recommendations for various statewide actions to increase the pool of minority teaching candidates, improve recruitment, reduce barriers to hiring, retention, and promotion of minority candidates, and increase support to retain minority educators.

Those recommendations appear to have served as the basis for MSDE's Action Plan for Minority Recruitment. The minutes of the meeting at which the State Board adopted the Action Plan state:

> The plan was developed in response to a task force finding that "the numbers of minority students in schools are on the rise while the numbers of minority teachers are decreasing."
>
> The plan outlines steps being taken by the Department in conjunction with local school systems and institutions of higher education to:
>
> - Promote teaching as a career for minority students;
>
> - Attract minority career-changers and retirees to teaching;
>
> - Assist schools in recruitment and retention of minority teachers;
>
> - Reduce barriers to minorities in pursuing careers in education.
>
> Activities to achieve these goals include reviving Future Teachers of Maryland clubs in high school and in colleges and

> universities, concentrating recruitment of teachers in selected geographical areas, holding workshops for teachers who have not passed the National Teacher Exams, and encouraging policy changes at all levels to reduce racial barriers to education careers.

Minutes of the State Board of Education (Aug. 31, 1988).

Other programs and initiatives have been adopted over the intervening years to address these same issues. Only last year, for example, the General Assembly passed legislation to study and make recommendations on strategies "to increase and improve the recruitment, preparation, development, and retention of high quality minority teachers in elementary and secondary education in the State." 2013 Md. Laws, ch. 286, § 1(a). The workgroup selected to perform that study issued its report in December 2013.[18] *See* Minority Teacher Recruitment, Study and Report (Dec. 2013).

We have not been able to find any express indication that the Action Plan or these subsequent policies were intended to replace the local plans required by the Integration Rule. However, the absence of any evidence that the State Board has continued to apply the rule suggests that these more recent policies have overtaken the Integration Rule as the State Board's preferred means of addressing their common goal of ensuring fair and inclusive faculty-hiring practices. We leave to the State Board, through the exercise of its broad visitatorial power over education policy, to determine how best to pursue that goal moving forward and what regulatory tools are best suited to achieve it.

---

[18] Many other government policies and guidelines have emerged for achieving diversity in our public schools. In March 2009, for example, the Office of the Attorney General issued a report titled "Strengthening Diversity in Maryland Colleges and Universities: A Legal Roadmap." While that report focuses on post-secondary education, much of the guidance on workplace diversity is applicable to elementary and secondary schools as well. *See* Report, pp. 17-19. Similarly, the U.S. Department of Education and the U.S. Department of Justice have published "Guidance on the Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools" (December 2011). Non-governmental groups have also published guidance on this topic. *See*, *e.g.*, Center for American Progress, "Increasing Teacher Diversity" (November 2011).

# III

## Conclusion

In our view, the plain language of the Integration Rule is susceptible to more than one reasonable interpretation with respect to the obligations it imposes on local school systems to adopt policies to attain a "racial balance" reflective of their communities. Our consideration of the available evidence regarding the State Board's intent in adopting the Integration Rule leads us to conclude that the regulation was intended to prevent discriminatory employment practices and ensure that school officials take active steps to include minority candidates for hiring or promotion on an equal basis with white candidates. So construed, we believe the Integration Rule would be constitutional.

It is further our opinion that the Integration Rule remains on the books as an MSDE regulation and that the plans submitted in 1971 may still be implemented to achieve the rule's purpose, as described herein. The State Board, however, has since developed other approaches to promoting minority employment and we defer to the State Board on the matter of what actions, if any, its current diversity and equal employment opportunity policies require of local boards.

> Douglas F. Gansler
> Attorney General of Maryland
>
> Jeffrey L. Darsie
> Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice

* Elizabeth M. Kameen, Assistant Attorney General, contributed significantly to the preparation of this opinion.